Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/03/2022 08:06 AM CDT

- 885 -

**Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports**
IN RE INTEREST OF DESTINY H. ET AL.
Cite as 30 Neb. App. 885

**In re Interest of Destiny H. et al.,
children under 18 years of age.
State of Nebraska, appellee,
v. Amber M., appellant.**

___ N.W.2d ___

Filed April 26, 2022.    No. A-21-258.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below.
2. **Parental Rights: Proof.** To terminate parental rights, it is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in Neb. Rev. Stat. § 43-292 (Reissue 2016) exists and that termination is in the child's best interests.
3. ____: ____. Under Nebraska law, terminating parental rights requires both clear and convincing evidence that one of the statutory grounds enumerated in Neb. Rev. Stat. § 43-292 (Reissue 2016) exists and clear and convincing evidence that termination is in the best interests of the children.
4. ____: ____. Neb. Rev. Stat. § 43-292(7) (Reissue 2016) operates mechanically and does not require the State to adduce evidence of any specific fault on the part of the parent.
5. ____: ____. Any one of the bases for termination of parental rights codified by Neb. Rev. Stat. § 43-292 (Reissue 2016) can serve as a basis for termination of parental rights when coupled with evidence that termination is in the best interests of the children.
6. **Parental Rights: Presumptions: Proof.** A child's best interests are presumed to be served by having a relationship with his or her parent. This presumption is overcome only when the State has proved that the parent is unfit.
7. **Constitutional Law: Parental Rights: Words and Phrases.** In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity

- 886 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF DESTINY H. ET AL.
Cite as 30 Neb. App. 885

which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being.

8. **Parental Rights: Words and Phrases.** A termination of parental rights is a final and complete severance of the child from the parent and removes the entire bundle of parental rights. Therefore, with such severe and final consequences, parental rights should be terminated only in the absence of any reasonable alternative and as the last resort.

9. **Parent and Child.** The law does not require perfection of a parent. Instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child.

10. **Parental Rights.** Whereas statutory grounds are based on a parent's past conduct, the best interests inquiry focuses on the future well-being of the child.

11. ____. The best interests and parental unfitness analyses in the context of a termination of parental rights case require separate, fact-intensive inquiries, but each examines essentially the same underlying facts.

12. **Parental Rights: Juvenile Courts: Pleadings.** Because the primary consideration in determining whether to terminate parental rights is the best interests of the child, a juvenile court should have at its disposal the information necessary to make the determination regarding the minor child's best interests regardless of whether the information is in reference to a time period before or after the filing of the termination petition.

Appeal from the Separate Juvenile Court of Douglas County: AMY N. SCHUCHMAN, Judge. Reversed and remanded for further proceedings.

Thomas C. Riley, Douglas County Public Defender, Reilly M. White, and Hilary Burrows, Senior Certified Law Student, for appellant.

Nathan Barnhill, Deputy Douglas County Attorney, and Traemon Anderson, Senior Certified Law Student, for appellee.

PIRTLE, Chief Judge, and RIEDMANN and WELCH, Judges.

PIRTLE, Chief Judge.

## INTRODUCTION

Amber M. appeals from an order of the separate juvenile court of Douglas County terminating her parental rights to

- 887 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF DESTINY H. ET AL.
Cite as 30 Neb. App. 885

her four minor children, Destiny H., De'Tevious M., D'Yauna S., and Jasani S. Based on our de novo review of the record, we conclude the State failed to adduce clear and convincing evidence that termination of Amber's parental rights was in the best interests of the children. We, therefore, reverse the order of the juvenile court terminating Amber's parental rights with respect to all four children and remand the cause for further proceedings.

## BACKGROUND

We are called to review the termination of Amber's parental rights with respect to her four biological children, Destiny (born April 2005), De'Tevious (born February 2008), D'Yauna (born December 2013), and Jasani (born August 2016). Each of the children have different fathers, none of whom are at issue in this appeal and thus will be discussed only as necessary to address Amber's claims.

The present case arose out of an incident on March 22, 2019, in which Amber left the youngest child, Jasani, home alone for approximately 2 hours. According to an affidavit by one of the police officers involved, officers were in the process of booking Amber into a correctional facility for shoplifting, when Amber informed the officers that Jasani was home alone. Officers discovered Jasani alone, "standing in the living room with his urine soaked pants down at his ankles." After Destiny and De'Tevious were located, all three children were placed in emergency protective custody and transported to a child advocacy center. There was no mention of D'Yauna in the affidavit, and she was not listed in the caption.

In the days following the incident, a child and family services specialist (CFSS) from PromiseShip conducted two initial assessments. The first assessment, conducted on the day of the incident, was a safety assessment pertaining to Destiny, De'Tevious, and Jasani only. After the safety assessment, the same CFSS conducted an initial risk assessment. Despite acknowledging that Destiny, De'Tevious, and Jasani were "the only children in the home," the CFSS also included

- 888 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF DESTINY H. ET AL.
Cite as 30 Neb. App. 885

information she learned with respect to D'Yauna. Because D'Yauna experienced a radically different progression in her custody with the Nebraska Department of Health and Human Services (DHHS) than did the other three children, we take this opportunity to discuss D'Yauna before returning to the chronology of events in this case.

In the risk assessment just mentioned, the CFSS reported that D'Yauna resided with her paternal aunt, Octavia S., and that "Octavia has also been the primary caregiver for [D'Yauna] since she was born." The CFSS further reported as follows:

> Amber says that she was going to sign over guardianship of [D'Yauna] a long time ago but then [D'Yauna's] dad said that he was not going to so [Amber] did not. Amber stated that she was willing to sign over legal guardianship of [D'Yauna] to Octavia as long as [D'Yauna's dad] was willing to do so as well. [The CFSS] was able to speak briefly with [him] over the phone. He did agree to sign over legal guardianship of [D'Yauna] to his sister Octavia . . . .

In early June 2019, Sarah Krohn, who was the DHHS case manager for this family throughout the life of the case, conducted a reunification assessment. Therein, Krohn reported that "[D'Yauna's] permanency objective at this time is being changed to guardianship due to [Amber's] agreeing to a guardianship and PromiseShip and the courts moving forward with this permanency objective." Krohn further reported that Octavia "is able to meet and exceed all of [D'Yauna's] basic needs including food, shelter, emotional, and permanency options . . . and she is willing to provide permanency for [D'Yauna] which has been agreed to by all parties."

In the first court report, the stated permanency objective for D'Yauna was guardianship, and the court found as much in its June 6, 2019, order. D'Yauna's stated permanency objective remained guardianship in the second, third, fourth, and fifth court reports. However, elsewhere in the fourth court report, Krohn wrote, apparently by mistake, that "Saint Francis

- 889 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF DESTINY H. ET AL.
Cite as 30 Neb. App. 885

continues to recommend that [D'Yauna] maintain in the care and custody of [DHHS] with a permanency objective of reunification." Consequently, in its January 24, 2020, order, the court identified a single permanency plan for all four children, finding that "with respect to the mother and the minor children, the permanency objective shall be reunification."

In the fifth court report, Krohn reiterated verbatim the language above recommending a permanency objective of reunification. Accordingly, in its March 17 and June 23, 2020, orders, the court identified D'Yauna's permanency objective as reunification. It was not until the sixth and final court report that the stated permanency objective for D'Yauna was actually changed from guardianship to reunification, but there was no discussion as to why that change was made.

With that, we return to the chronology of events pertaining to Destiny, De'Tevious, and Jasani. The risk assessment conducted by the PromiseShip CFSS in March 2019 listed five prior child protective services intakes related to this family, four of which were "unfounded." The one "Court Substantiated" intake related to an incident in February 2013 in which Amber unexpectedly left Destiny and De'Tevious with her sister for approximately a week. Amber admitted that she was struggling with addiction to "PCP" at that time and that leaving the children with her sister was "her way of getting help for her drug use." Amber reported that she "has not used PCP" since that time. Amber reported occasional marijuana and alcohol use but denied any current issues with addiction or substance abuse. The CFSS added that "Amber says that she knows that her family says that she is high or using again but it is just her prescriptions that she has now."

As it relates to Amber's mental health, she reported that she admitted herself into inpatient psychiatric care in April 2018 following a suicide attempt. Amber reported that she was diagnosed with "major depression, PTSD, and bipolar" for which she was prescribed multiple psychotropic medications. She reported that she had been struggling with depression since

- 890 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF DESTINY H. ET AL.
Cite as 30 Neb. App. 885

Destiny was born in 2005, but added that "everything really started to become harder" after she was "attacked" in 2017.

With respect to the children, the CFSS reported that each child "appeared to be happy and healthy," dressed in "weather appropriate clothing that appeared to be clean, well-fitting, and in good repair," and each "appeared to be clean and well groomed." The CFSS also conducted a walkthrough of the family home, which "was clean and free of any clutter or trash," and the CFSS ultimately reported "no concerns for the physical safety of the home."

The CFSS then spoke to Tracy P., who is Amber's mother and was the foster placement for Destiny, De'Tevious, and Jasani throughout this case. Tracy corroborated Amber's report of drug use, stating that "Amber was smoking 'wet' a long time ago when she dropped Destiny and [De'Tevious] off with [her sister]." However, Tracy added that she "heard that [Amber] was smoking it again."

As a result of the safety assessment, the CFSS concluded that the children were unsafe "as Amber was arrested and booked into jail and Jasani was found to be at home by himself." As a result of the risk assessment, the CFSS concluded that the children were at high risk, noting that "Amber was very cooperative" but that there were "a lot of concerns for [Amber's] mental health and possible drug use of wet that Amber is not reporting."

On March 25, 2019, the State filed a juvenile petition alleging that all four children, including D'Yauna, "lack(s) proper parental care by reason of the fault or habits of [Amber]," under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). The State also filed a motion for immediate custody captioned "In the Interest of Juvenile(s) set forth in Exhibit 'A'." There was no mention of D'Yauna in exhibit A, which consisted entirely of the police officer's affidavit mentioned above.

On the same day, the court ordered DHHS to take immediate temporary custody of Destiny, De'Tevious, and Jasani on the grounds provided in exhibit A. There was no discussion of

- 891 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF DESTINY H. ET AL.
Cite as 30 Neb. App. 885

D'Yauna in the court's order, and she was not listed in the caption. However, on March 27, 2019, the court entered an order appointing a guardian ad litem for all four children. Then, on March 28, the State filed a second motion for immediate protective custody with respect to D'Yauna alone. It is not clear from the record when the court made a ruling on this motion, but the court later found, in its order terminating Amber's parental rights, that "D'Yauna was formally made a state ward and removed from [Amber's] custody in April of 2019." In any case, the record is clear that Destiny, De'Tevious, and Jasani were removed from Amber's home and placed with their grandmother, Tracy, and that D'Yauna remained at all times in the care and custody of her paternal aunt, Octavia.

On April 3, 2019, Amber made her first appearance and participated in a prehearing conference. Amber entered, and the court accepted, a plea of denial to the State's initial petition. The court found probable cause to support the State's initial petition and ordered all four children to remain in temporary DHHS custody. The court also "invited" Amber to participate in a number of services and ordered that "the services for [Amber] shall be arranged and paid for by [DHHS] and/or PromiseShip unless [Amber] has insurance and is able to pay."

While we do not have access to any of Amber's treatment records or evaluations, we know from Krohn's reporting that Amber underwent a psychiatric evaluation in early April 2019 and was diagnosed with "major depressive disorder, recurrent, severe, with psychosis; rule out bipolar disorder; generalized anxiety disorder; PTSD; nicotine dependence; cannabis abuse; rule out alcohol abuse; and phencyclidine dependence." Amber was recommended to continue taking the medications "Lexapro, Prazosin, and Seroquel" and to undergo a chemical dependency evaluation. Amber underwent a chemical dependency evaluation, which recommended she complete "Level III.5 residential treatment for chemical dependency with an emphasis on co-occurring mental health disorders." Amber

- 892 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF DESTINY H. ET AL.
Cite as 30 Neb. App. 885

successfully completed the recommended residential treatment at "Inroads to Recovery" from "April of 2019 to May 17th, 2019."

In a family strength and needs assessment conducted in early May 2019, Krohn wrote that Destiny and De'Tevious both reported a "good relationship" with Amber, and Krohn noted that De'Tevious "appears to really miss his mother" and "is bonded with his mother, as he has been asking this FPS on multiple occasions if and when he can see his mother." The family assessment also contained the first mention of Amber's losing access to her Medicaid health insurance, as Krohn reported that "Amber no longer has Medicaid due to the children being removed." Krohn later confirmed in her trial testimony that Amber lost access to her medications "around May of 2019," as "[s]he didn't have insurance because her children were removed."

As previously mentioned, Krohn conducted a reunification assessment in early June 2019. With respect to the ongoing risk to the children, Krohn noted the lack of progress, ongoing mental health concerns, and "possible substance abuse concerns" as the primary obstacles to reunification. Krohn added that "Amber continues to report that she is in a relationship with the father of her youngest child," who was identified as Jonquez S., "despite admitting to multiple concerns of domestic violence." However, the record contains conflicting evidence on this point.

In the prior safety assessment, the CFSS also reported a history of domestic abuse between Amber and Jonquez; however, Amber told the CFSS that "she left Jonquez about a year ago or more maybe." Likewise, Destiny told the CFSS that "[Amber] has not been seeing anyone [and] that sometimes Jonquez still comes around but not very often." De'Tevious also reported that Amber "was not seeing anyone that he knew about." Tracy, on the other hand, reported to the CFSS that "as far as she knows Amber is still seeing Jonquez on a regular basis." Tracy added that "Jonquez is very abusive and

- 893 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF DESTINY H. ET AL.
Cite as 30 Neb. App. 885

controlling of Amber from what she hears but she does not know much because Amber does not talk to her."

In stark contrast, Krohn wrote in the family assessment that "Amber reports that she is in a relationship with [Jonquez]." Krohn further observed that "[t]here are concerns from multiple parties that the relationship is unhealthy and that domestic violence has occurred and continues to occur in the relationship." However, aside from Tracy, it is unclear who Krohn actually spoke to regarding the family assessment. Krohn noted that the information "was provided some by family and some by collateral information," adding that "Amber is currently at InRoads to Recovery due to her mental health and this FPS was able to complete her needs based on collateral information."

Moreover, Amber's relationship with Jonquez was not the only inconsistency between the CFSS' and Krohn's reporting. With respect to her relationship with Tracy, Amber reported to the CFSS that "her mom never does anything for her but talk down to her." Further, Amber reported that "she did not have a good childhood[,] that her mom would be physical [sic] abusive towards her a lot when she was angry[, and] that she was in foster care when she was younger because of her mom [sic] drug use." Again, in stark contrast, Krohn wrote that "Amber reports that she has a strong support system in her mother for the majority of things, but does feel she can be tougher on her than other people."

As it relates to Amber's relationship with Tracy, Karen Sides, who was the visitation worker for this family throughout the life of this case, testified that Amber and Tracy had a "very volatile relationship." Moreover, Krohn later reported that Amber "continues to struggle with building a relationship with [Tracy]." There was no further discussion, at trial or otherwise, of a continued relationship between Amber and Jonquez.

Krohn prepared six court reports in this case. Each court report contained a case plan, which listed the family's goals and progress toward completing them. The case plan listed two goals for Amber and one goal for the children. First, Amber

- 894 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF DESTINY H. ET AL.
Cite as 30 Neb. App. 885

"will address her mental health and coping skills." Second, Amber "will be able to provide for her children's emotional, physical, mental, and educational needs." The children "will reside in a home in which their basic physical, emotional, medical, educational, and permanency needs are being met." Krohn identified strengths related to these goals, noting that "Amber is willing to address her mental health[,] expresses a desire to parent her children[, and] is currently involved in services."

On May 30, 2019, the State filed an amended petition alleging that all four children "is/are homeless or destitute, or without proper support through no fault of [Amber], to wit: A. Amber . . . has been diagnosed with severe mental illnesses [such that] she is unable to provide proper parental care, support and/or supervision." On June 6, Amber appeared for an adjudication and disposition hearing on the State's amended petition. Amber entered, and the court accepted, a no contest plea to the amended petition as above. The court thus adjudicated all four children to be within the meaning of § 43-247(3)(a) "by a preponderance of the evidence and through **no fault** of the parent." (Emphasis in original.) The court ordered the children to remain in temporary DHHS custody but noted that "[Amber] has begun to make therapeutic progress by participating in pre-adjudication services."

The court further ordered Amber to participate in a number of services, including individual therapy, supervised visitation, family therapy if recommended, medication management, family support services, drug testing, parent training, and domestic violence programming. The court again ordered that "services for [Amber] shall be arranged and paid for by [DHHS] and/or PromiseShip unless [Amber] has insurance and is able to pay." The court also ordered the children to participate in individual therapy if recommended by an initial diagnostic interview.

In the second court report, prepared in July 2019, Krohn reported that "Amber . . . is currently recommended to

- 895 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF DESTINY H. ET AL.
Cite as 30 Neb. App. 885

complete Intensive Outpatient Therapy," adding that "Amber was recommended to continue attending In-Roads, however due to payment concerns this was not successful." Krohn further reported that Amber was not participating in drug testing, and the record indicates that Amber never participated in drug testing throughout this case. Krohn also reported that Destiny and De'Tevious were both scheduled to begin individual therapy. Krohn later confirmed, in October 2019, that Destiny and De'Tevious had been attending individual therapy every other week since July.

The court, with a new judge presiding, convened for a continued disposition hearing on November 5, 2019, and it appears Amber was not present. On November 7, the court entered an order finding that it was "unable to enter informed findings regarding therapy for the minor children for the reason that it has no information with respect to therapeutic issues being addressed." Accordingly, the court demanded that "[a]t the next scheduled hearing [DHHS] shall provide progress reports to the Court from the children's therapist(s) and [Amber's] therapist." The court also ordered Amber to undergo an updated chemical dependency evaluation within 30 days.

In the fourth court report, prepared in January 2020, Krohn wrote that Amber "reported that she had completed an [updated chemical dependency] evaluation with Omaha Insomnia and Psychiatric Services." However, Krohn was unable to obtain a copy of that evaluation, so Amber was referred to undergo another chemical dependency evaluation at Heartland Family Services, which she completed in January 2020. With respect to visitation, Amber reported to Krohn that she was struggling to consistently attend visits due to her mental health, although Krohn observed that "Amber has been making more of an effort to attend her visits as evidenced by the number of visits she is attending going up."

The case plan in the fourth court report contained the only substantive progress report to date. With respect to the first goal that Amber address her mental health, Krohn reported

- 896 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF DESTINY H. ET AL.
Cite as 30 Neb. App. 885

that Amber was not attending outpatient therapy because "she reports that she has not found an appropriate therapist." Krohn added that "Amber is not on medication as she reports that she is not able to afford ongoing medications" and she "is continuing to struggle with her mental health." With respect to the second goal that Amber provide for her children's needs, Krohn reported that Amber "does not have proper housing, or employment to care for the children."

With regard to Amber's housing, the record demonstrates that Amber initially resided in a three-bedroom house she obtained through the federally subsidized "Section 8" housing program administered by the local housing authority. Sides testified that Amber was evicted from this home because she failed to report the children's removal to the housing authority and then accumulated a $7,000 balance. The record is not entirely clear as to the timeline of these events, but Krohn testified that Amber was evicted in July 2020. Both Krohn and Sides testified that weekly visits primarily took place at Amber's home until "COVID 19 hit." Sides testified that after she was evicted, Amber secured a new apartment "on her own."

With regard to Amber's employment, Krohn testified that Amber was working as "a CNA in a nursing home" when the case began and that she worked briefly "in a pantry" sometime between August and September 2019. The record indicates that Amber was not gainfully employed at any point thereafter. Although, at the direction of the court, Amber applied for and obtained Supplemental Security Income benefits which provided Amber with approximately $900 per month beginning in July 2020.

With respect to the children's goal that they reside in a home which meets their needs, Krohn included brief updates on Destiny and De'Tevious' reported progress with therapy, but there remained no mention of the requested therapy progress reports from the children's therapists. While a second progress update for the children was entered in August 2020, it

- 897 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF DESTINY H. ET AL.
Cite as 30 Neb. App. 885

appears Krohn largely reiterated verbatim her comments from the December 2019 update.

On March 9, 2020, before a third presiding judge, Amber appeared for a review and permanency planning hearing. On March 17, the court ordered that "St. Francis shall: 1. Provide the Court with copies of [Destiny and De'Tevious'] psychological evaluation and therapy progress reports." Following a subsequent hearing on June 23, the court again found that "no therapy report for the minor children was provided." Despite Krohn's later reporting that Destiny and De'Tevious both completed a "full psychological evaluation" in February 2020, the court also found that "the children's psychological evaluations are not completed as of yet." Accordingly, on June 23, the court again ordered DHHS to provide this evidence and to "[d]evelop and identify the permanency objective for the minor children taking into account input from the therapists and foster care providers."

Three days later, the State moved to terminate Amber's parental rights with respect to all four children. The motion alleged that D'Yauna came within the meaning of Neb. Rev. Stat. § 43-292(1), (2), (6), (7), and (9) (Reissue 2016) and that Destiny, De'Tevious, and Jasani came within the meaning of § 43-292(2), (6), (7), and (9). The motion did not identify any factual basis with respect to the allegations under § 43-292(1), (2), (7), and (9). With respect to the allegations under § 43-292(6), the State alleged only that "[d]espite over a year of Juvenile Court involvement, [Amber] has failed to make any measurable sustained progress toward reunification with her children." The State thus alleged that it was in the best interests of all four children that Amber's parental rights be terminated.

In the sixth and final court report, prepared in August 2020, there remained no mention of the requested therapy progress reports or psychological evaluations. In lieu of this information, Krohn observed that Destiny "has not been addressing her emotions with the therapist however has been working on

- 898 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF DESTINY H. ET AL.
Cite as 30 Neb. App. 885

these with [Tracy]" and De'Tevious "is working on addressing his anger and is learning coping skills per the therapist." Krohn also reported that both Destiny and De'Tevious were recommended to participate in family therapy, but it is not clear if family therapy was ever pursued or even presented to Amber as an option. Attached to the final court report was a transition plan for Destiny in which Krohn reported that "Destiny would like to reunify with her mother, and all services are being provided in compliance with this goal."

A trial on the State's motion took place over the course of 3 days from October 2020 to February 2021. The State called three witnesses: Tracy testified on October 6, 2020; Sides testified on January 26, 2021; and Krohn testified on February 3. Tracy primarily testified to her observations on four occasions from April to July 2020. First, Tracy testified about an incident in April 2020, where Amber came to Tracy's house with a butcher knife around "one or two o'clock in the morning." According to Tracy, Amber was talking about how a man stole her "juice." Tracy testified that Amber had previously indicated to her that "juice" was "the stuff — that drug that she smokes called wet."

Tracy testified further about Amber's behavior on three occasions in June and July 2020. Tracy testified that on those occasions, Amber's "behavior, her movement, her language was off." While the record clearly indicates that Tracy was trying to insinuate Amber was "high" on these occasions, the testimony properly adduced on the record merely reflects that Amber was "moving and speaking in a way that Amber does" and that she "didn't articulate her words correctly."

With regard to a bond between Amber and the children, Tracy testified, "I'm not going to say that they have a bond with her anymore." However, Tracy added that there "[a]bsolutely" was a bond at the beginning of the case. According to Tracy, the bond "just started to fade because their visits were not consistent." In contrast, Sides testified to her belief that Amber was bonded with Destiny, De'Tevious, and Jasani.

- 899 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF DESTINY H. ET AL.
Cite as 30 Neb. App. 885

When asked about the basis for her belief, Sides stated, "you know, her — just — a rock and a hard place. . . . I think she loves them. I think she's bonded with them."

With respect to visitation, Sides testified that Amber's participation was often irregular, noting that when she did show up for visits, she was often late and difficult to communicate with. Prior to "COVID," which we presume to mean from approximately May 2019 to March 2020, Amber "was offered" 47 visits and 24 of them "were cancelled." However, Sides clarified that the 23 visits which did occur "pretty much happened on a routine basis once a week." Krohn also testified that Amber "maintained consistency" with weekly visits until the end of 2019.

With regard to "after COVID," Sides testified that there were no visits in March 2020 and two conference call visits in April 2020. Sides testified that "face-to-face" visitation resumed in May 2020, and we know from the final court report that Amber participated in six visits from May to June. However, Sides then provided troubling testimony with regard to visitation from June to October 2020.

First, Sides indicated that Tracy canceled three of five scheduled visits in June. Sides then testified that Tracy canceled "at least three" visits in July due to her "not being willing to have visits in her yard." Sides continued, "actually it got worse," recalling that August 2020 was "when [Tracy] got worse about saying that [Amber] needed . . . a negative COVID test" to participate in visitation at her house. When asked about possible alternative locations for visitation, Sides stated, "[Tracy] wanted to be around the visit to see it." When asked if it was a requirement that Tracy be present for visits, Sides responded as follows:

> Absolutely not. And like I told you . . . I kept calling and e-mailing the case manager to see if [Tracy] had that control. And when I finally heard back, she said no, she has to allow them to do visits. And that's when we started that at Heartland Family Service [sic].

- 900 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF DESTINY H. ET AL.
Cite as 30 Neb. App. 885

Sides stated that no other locations were offered until they got approval from Krohn to have visits at Heartland Family Services, "which didn't come for a very long time."

Sides was asked to "explain what time frame you were having difficulty getting in touch" with Krohn, to which she responded, "[a]ll the time," from "almost the very beginning of this case." Specifically, as it relates to Tracy's interference with visitation, Sides stated that communication difficulties continued through the summer months and into September and October 2020 as well. Perhaps not coincidentally, Krohn testified that she "couldn't contact" Amber from approximately "July through November [2020]"—roughly the same period of time during which Sides was struggling to contact Krohn.

During this roughly 4-month period, Sides estimated that Tracy canceled "one-fourth" of the scheduled visits. Of the remaining scheduled visits, it is not clear how many occurred or how they went. Sides confirmed that visits resumed at Heartland Family Services in October 2020. Sides also testified to at least one visit with all three children in January 2021, which was followed by a few weeks of no visits. Moreover, Krohn testified to at least one visit in December 2020. However, aside from this limited testimony, the record is clearly lacking with regard to visitation or other progress that may or may not have occurred between August 2020 and February 2021.

When asked about the State's amended petition in this case, Krohn testified that she understood what a "no-fault petition" was but did not recall such a petition in this case. Nevertheless, Krohn was generally aware of Amber's mental health diagnoses and prescribed medications. Krohn testified that although she could not recall exactly, she believed Amber regained access to her medications in "mid 2020" when "she started receiving disability payments." We note that Amber, in her brief on appeal, also asserts that she "lost her insurance and could not afford her medications again until July of 2020, when her disability payments began." Brief for appellant at 23.

- 901 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF DESTINY H. ET AL.
Cite as 30 Neb. App. 885

However, Krohn and Sides both testified that Amber would have relied on Medicaid, not disability payments, to pay for her medications. Sides noted that Amber "only gets nine something" from Social Security, such that with her apartment and other expenses, there would be "very little money left" for medications. Moreover, Sides testified that she did not believe Amber had health insurance as of the January 26, 2021, hearing. Sides added that Amber had recently reapplied for Medicaid but that she was not aware whether she had been reapproved. Sides further confirmed that if Amber had been reapproved for Medicaid, it "would [have been] a relatively recent" development.

Krohn suggested that "Lutheran Family Services was able to provide [Amber] with [a] month or two months' worth of medications," but she added that "they couldn't continue on due to the fact that we couldn't afford it." Additionally, Krohn suggested Amber was at some point receiving medications from "Omaha Insomnia." However, there was no indication as to the time period during which Amber purportedly received medication from either of these facilities, and there is nothing in the record to confirm Krohn's reports. Even if we assume Amber regained access to her medications in July 2020, the record indicates this would have left her without medication for at least 14 months. At trial, and now on appeal, Amber's counsel seemed to take for granted that Amber had been without her medication for "nine months" of this case. Brief for appellant at 16. However, we cannot say for certain that it was not much longer than that.

With regard to Amber's progress on court-ordered services, Krohn testified that Amber "didn't show any desire to participate in the programs that we needed to see her do." However, Krohn also testified that Amber did complete many court-ordered services, including over a month of inpatient treatment, family support services, at least two chemical dependency evaluations, a psychiatric evaluation, a psychological evaluation, hands-on parent training, domestic

- 902 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF DESTINY H. ET AL.
Cite as 30 Neb. App. 885

violence programming, and a parenting class. Krohn identified only three court orders that, in her opinion, Amber did not successfully complete—outpatient treatment, drug testing, and visitation.

Krohn testified that she only actually witnessed Amber interact with the children on "a couple of occasions" and agreed that "when it comes to the regular visitation and what goes on," that information came from Sides' reports. According to Krohn, per those reports, visitations were not always "appropriate" and there were "a lot of visits in which [Amber] would just allow the children to watch TV the entire time and not engage with them." However, Sides testified that Amber "always engaged with her children during the visits." Sides added that she never had to shorten a visit and agreed that Amber was always "appropriate" with the children.

After trial, on February 23, 2021, the court entered an order finding that all four children came within the meaning of § 43-292(2), (6), and (7) and that it was in the children's best interests that Amber's parental rights be terminated. Accordingly, the court terminated Amber's parental rights with respect to all four children. This appeal followed.

## ASSIGNMENTS OF ERROR

Amber assigns that the juvenile court erred in finding clear and convincing evidence that Destiny, De'Tevious, Jasani, and D'Yauna came within the meaning of § 43-292(2), (6), and (7), and in finding clear and convincing evidence that termination of Amber's parental rights was in the children's best interest.

## STANDARD OF REVIEW

[1,2] An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). It is the State's burden to show by clear and convincing evidence

- 903 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF DESTINY H. ET AL.
Cite as 30 Neb. App. 885

both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *Id.*

## ANALYSIS

[3] Under Nebraska law, terminating parental rights requires both clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and clear and convincing evidence that termination is in the best interests of the children. See *In re Interest of Donald B. & Devin B.*, 304 Neb. 239, 933 N.W.2d 864 (2019).

*Statutory Grounds for Termination.*

[4,5] The State alleged a number of statutory grounds for termination, including § 43-292(7), which allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." Section 43-292(7) operates mechanically and does not require the State to adduce evidence of any specific fault on the part of the parent. See *In re Interest of Mateo L. et al., supra*. Any one of the bases for termination of parental rights codified by § 43-292 can serve as a basis for termination of parental rights when coupled with evidence that termination is in the best interests of the children. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020).

In this case, the juvenile court found that all four children came within the meaning of § 43-292(7). Based on our de novo review of the record, we also find clear and convincing evidence that all four children come within the meaning of § 43-292(7).

With respect to D'Yauna, the record shows that she has been living with Octavia almost exclusively since her birth in 2016 and that she has "not seen [Amber] consistently for the majority of her life." Moreover, D'Yauna was "officially" removed from Amber's care in April 2019. Thus, it is clear that D'Yauna was in an out-of-home placement for at least 15 of the most recent 22 months. With respect to Destiny, De'Tevious, and Jasani, the record shows that they were removed from

- 904 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF DESTINY H. ET AL.
Cite as 30 Neb. App. 885

Amber's home in March 2019 and were never returned. Thus, it is also clear that they had been in an out-of-home placement for at least 15 of the most recent 22 months.

Having determined the State proved at least one statutory ground enumerated in § 43-292, we need not consider the sufficiency of the evidence concerning the other statutory grounds for termination identified by the juvenile court. See *In re Interest of Mateo L. et al., supra*. Accordingly, we conclude the juvenile court did not err in finding that all four children came within the meaning of § 43-292(7), and Amber's first assignment of error is without merit.

*Best Interests.*

[6,7] We turn to the second prong of the termination analysis and examine whether the record contains clear and convincing evidence that termination of Amber's parental rights was in the best interests of the children. A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Id.*

[8-11] A termination of parental rights is a final and complete severance of the child from the parent and removes the entire bundle of parental rights. *In re Interest of Justin H. et al.*, 18 Neb. App. 718, 791 N.W.2d 765 (2010). Therefore, with such severe and final consequences, parental rights should be terminated only in the absence of any reasonable alternative and as the last resort. *Id.* The law does not require perfection of a parent. *Id.* Instead, we should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *Id.* Whereas statutory

- 905 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF DESTINY H. ET AL.
Cite as 30 Neb. App. 885

grounds are based on a parent's past conduct, the best interests inquiry focuses on the future well-being of the child. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). The best interests and parental unfitness analyses require separate, fact-intensive inquiries, but each examines essentially the same underlying facts. *Id.*

Based on our de novo review of the record, we find that the State failed to adduce clear and convincing evidence that termination of Amber's parental rights was in the children's best interests. First, we acknowledge that the record contains substantial evidence tending to demonstrate that Amber was unfit to parent her children at the time of trial. Amber has a history of addiction and suffers from severe mental illnesses, and she failed to participate consistently in court-ordered services intended to address the same. After more than a year of juvenile court involvement, Amber failed to progress beyond weekly supervised visitation with her children, and Amber's participation in visitation was troublingly irregular.

We also acknowledge that Amber's "possible substance abuse" remained a persistent concern throughout this case. Indeed, it is concerning and suspicious that Amber wholly failed to participate in court-ordered drug testing. However, there is scant evidence in the record demonstrating the degree to which Amber's "issues" with substance abuse were or were not resolved. This is not to say that such evidence does not exist, as Amber participated in a psychiatric evaluation, a psychological evaluation, at least two chemical dependency evaluations, over a month of residential inpatient treatment, and, to a lesser extent, outpatient therapy with a number of different providers. However, none of this evidence appears in the record. Moreover, there was no mention of substance abuse concerns in either of the State's juvenile petitions or in its motion to terminate parental rights. Rather, Tracy's largely speculative concerns, as amplified by Krohn's reporting, appear to be the primary foundation for the State's substance abuse concerns.

- 906 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF DESTINY H. ET AL.
Cite as 30 Neb. App. 885

From our review of the record, Amber's ongoing struggle with mental illness remained at all times the primary concern for this family, and the record demonstrates that Amber's opportunities to make progress on her mental health were severely limited. At the outset of this case, Amber was recommended to continue taking multiple prescription medications intended to address her mental illness. Furthermore, Amber was at all times ordered to participate in medication management. Yet, for much of this case, and through no fault of Amber's, it appears there were no medications to manage. Rather, Amber went without her prescribed medications for a significant, albeit uncertain, portion of this case. Despite her severe mental illness being the sole basis for the State's amended petition, there appears to have been very little done to provide Amber with a reasonable opportunity to achieve stability in that regard.

Nevertheless, Amber managed to make substantial progress through at least the first half of this case. She consistently participated in weekly visits, many of which occurred in her home. Amber also fully participated in a plethora of court-ordered services. Notably, Amber successfully completed over a month of inpatient treatment. Thereafter, Amber was recommended to continue outpatient treatment at the same facility, but was precluded from doing so due to "payment concerns." Moreover, Krohn suggested that "Lutheran Family Services was able to provide [Amber] with [a] month or two months' worth of medications," but that service was apparently discontinued because DHHS "couldn't afford it." It is difficult to reconcile the court's orders that DHHS pay for Amber's services with the apparent realities of this case.

While Amber's progress certainly stalled during the latter half of this case, the record reveals that her opportunities for continued progress were further limited by substantial interference with visitation from June to October 2020, which was aggravated by what was at best inattention from the DHHS case manager. Moreover, the confusion regarding

- 907 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF DESTINY H. ET AL.
Cite as 30 Neb. App. 885

D'Yauna's permanency objective, the fact that three different judges presided over this case, and the complete absence of relevant evidence from Amber's mental health providers appears to have adversely affected the court's analysis of Amber's parental fitness.

[12] So, even though the State may have met its burden of proving at least one statutory ground for termination as set forth in § 43-292(7), we would still need to examine the record for clear and convincing evidence that terminating Amber's parental rights was in the children's best interests. Unfortunately, the record in this case is severely lacking with regard to information necessary to assess the best interests of the children. Because the primary consideration in determining whether to terminate parental rights is the best interests of the child, a juvenile court should have at its disposal the information necessary to make the determination regarding the minor child's best interests regardless of whether the information is in reference to a time period before or after the filing of the termination petition. *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005).

In *In re Interest of Aaron D.*, the Nebraska Supreme Court noted that "[t]he State did not present testimony from, or even reports or records authored by, any of [the child's] therapists," save one therapist who largely testified in favor of keeping the parental relationship intact. 269 Neb. at 263, 691 N.W.2d at 174. Further the court noted that "[a]bsent a few [references] to events occurring after the filing of the State's termination petition, the record is devoid of evidence showing what was happening in [the child's] life between the filing of the petition in October 2003 and trial in February 2004." *Id.*

Furthermore, the court in *In re Interest of Aaron D.* observed that "the State used [the case manager] as a proxy for all of the other witnesses whose expertise and testimony would have been helpful, and perhaps essential, in determining what was in [the child's] best interests." 269 Neb. at 261, 691 N.W.2d at 174. While the case manager's testimony "was based to

- 908 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF DESTINY H. ET AL.
Cite as 30 Neb. App. 885

some extent on her own observations," the court also observed the testimony was "in large measure" based on the case manager's "review of the records and reports generated by the family support workers, therapists, foster parents, and others who directly observed the parties." *Id.* at 261-62, 691 N.W.2d at 174. Thus, the court found that "[i]t is very difficult, with the record presented in this case, to give substantial weight to some of the key allegations made by [the case manager]." *Id.* at 262, 691 N.W.2d at 174.

We find that the record in this case bears a concerning resemblance to that described by the Supreme Court in *In re Interest of Aaron D., supra*. With regard to Destiny, De'Tevious, and Jasani, it is true that the State adduced testimony from their foster parent and visitation worker; however, such testimony centered on the witnesses' recollections of Amber's past behavior rather than the future well-being of the children. With regard to D'Yauna, the record is largely devoid of relevant evidence aside from initial reports that everyone involved had agreed to permanency through guardianship with Octavia. Moreover, the mysterious evolution of D'Yauna's permanency objective throughout this case is concerning to say the least. Altogether, we conclude the record in this case is unacceptably inadequate. Like in *In re Interest of Aaron D.*, the State appears to have focused almost exclusively on Amber's shortcomings, neglecting to adduce much of the evidence germane to the best interests of the children.

Based on our de novo review of the record, we find the State failed to adduce clear and convincing evidence that terminating Amber's parental rights was in the best interests of the children. Accordingly, we reverse the juvenile court's termination of Amber's parental rights and remand the cause for further proceedings.

## CONCLUSION

We conclude the court did not err in finding clear and convincing evidence of a statutory basis for termination of

- 909 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF DESTINY H. ET AL.
Cite as 30 Neb. App. 885

parental rights under § 43-292(7). However, we conclude the State failed to adduce clear and convincing evidence that terminating Amber's parental rights was in the best interests of the children. Accordingly, we reverse the order of the juvenile court terminating Amber's parental rights with respect to all four children and remand the cause for further proceedings.

Reversed and remanded for
further proceedings.