IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF JONATHAN C. & ZACHARY C.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF JONATHAN C. AND ZACHARY C., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

BARTON C., APPELLANT.

Filed January 16, 2024.    No. A-23-410.

Appeal from the County Court for Cass County: DAVID J. PARTSCH, Judge. Affirmed.

Michael Ziskey, of Fankhauser, Nelsen, Werts, Ziskey & Merwin, P.C., L.L.O., for appellant.

Sarah M. Sutter, Chief Deputy Cass County Attorney, for appellee.

RIEDMANN, BISHOP, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Barton C. appeals from the order of the Cass County Court, sitting in its capacity as a juvenile court, terminating his parental rights to Jonathan C. and Zachary C. Barton argues that the court erred in finding that the State's evidence was sufficient to support termination of his parental rights. For the reasons stated herein, we affirm.

## II. STATEMENT OF FACTS

### 1. BACKGROUND

Barton and Tabatha F. are the biological parents of Jonathan, born in 2006, and Zachary, born in 2010.

- 1 -

On December 1, 2019, the State filed a petition alleging that Jonathan and Zachary were children within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) due to the faults or habits of Tabatha. Although the initial adjudication petition related to Tabatha, Tabatha has relinquished her parental rights, is not part of this appeal, and will only be referenced as needed for context.

On December 10, 2019, Jonathan was removed from Tabatha's home by law enforcement and was placed in the temporary legal custody of the Department of Health and Human Services (DHHS) where he remained at the time of the May 13, 2020, adjudication by the court. Zachary was removed from Tabatha's home on January 27, 2021. Both children have remained in out-of-home placement during the pendency of this case.

At the time that the children became involved with DHHS, Barton had been absent from their lives for 7 years in part due to his incarceration in Colorado. After Barton was incarcerated, Tabatha and the children relocated to Nebraska. Barton alleged that he became aware of the ongoing DHHS case in September 2020. After speaking with the Guardian ad Litem (GAL) on October 28, Barton, pro se, filed a request to intervene and a request for counsel. He subsequently traveled from Colorado to Nebraska but remained a resident of Colorado and was in the process of moving to Oklahoma due to his employer moving its operations to that state. When Barton arrived in Nebraska, Zachary remained in Tabatha's care and Jonathan had been placed in a therapeutic group home as a result of his behaviors. Without DHHS' knowledge, Tabatha and Barton arranged for an unsupervised visit to occur between Zachary and Barton.

On January 6, 2021, in considering Barton's motion to intervene, the court ordered therapeutic visits with Jonathan and unsupervised visits with Zachary unless the court received an objection. The GAL filed an objection indicating that Barton had an unsupervised visit with Zachary over the holidays; that the school counselor indicated that she was concerned about the effect on Zachary meeting Barton because Barton had not been a part of Zachary's life for several years; and that Zachary's therapist recommended supervised visitation between Barton and Zachary and that Barton cooperate and work with the therapist to facilitate successful interactions. Following the GAL's objection to unsupervised visits, Barton's visits with Zachary were ordered to be supervised and Barton was offered voluntary family support services.

Following comments by Barton about wanting to take the children to Oklahoma, the State filed a supplemental petition on February 3, 2021, as amended on April 21, which alleged that:
• Zachary and Jonathan were without proper support through no fault of Barton;
• prior to October 28, 2020, Barton had been absent from the children's lives for approximately 7 years;
• and that both children had a need for behavioral and/or mental health therapy and services with parental participation.

In April 2021, Barton admitted to the allegations contained in the amended supplemental petition and the matter proceeded to immediate disposition. Barton was ordered to participate in supervised visitation with Zachary, to cooperate with a family support worker and therapy as directed, maintain a suitable residence, obtain and maintain gainful employment, maintain reasonable contact with the case manager and providers, and abstain from the use of alcohol and

all controlled substances not prescribed. The court also ordered that Barton and the children participate in individual and family therapy arranged and approved by DHHS.

## 2. MOTION FOR TERMINATION

On July 26, 2022, the State filed a motion to terminate Barton's parental rights on the grounds that: Barton had substantially and continuously or repeatedly neglected and refused to give Zachary and Jonathan necessary parental care and protection under Neb. Rev. Stat. § 43-292(2) (Reissue 2016); reasonable efforts to preserve and reunify the family failed to correct the conditions leading to their adjudication under § 43-292(6); and Jonathan and Zachary had been in out-of-home care for 15 or more months of the most recent 22 months under § 43-292(7). The State also alleged that Barton was an unfit parent and that termination of Barton's parental rights was in Jonathan and Zachary's best interests.

## 3. TERMINATION HEARING

The termination hearing was held on January 5, 2023. Testimony was adduced from Lori Larson, DHHS caseworker; Joyce Hicks, therapist; and Barton. The court received multiple exhibits including DHHS court reports and case plans, Barton's psychological evaluation, and the Interstate Compact on the Placement of Children (ICPC) report completed by the Oklahoma Department of Human Services (OKDHS).

### (a) Barton's Time in Nebraska

In April 2021, Larson was assigned as the caseworker for Barton, Jonathan, and Zachary. She testified that after the children were placed in the legal custody of DHHS, as part of DHHS' regular practice, letters were sent to Barton's possible addresses in an attempt to notify Barton of the ongoing case involving Jonathan and Zachary.

During the trial, Barton acknowledged that he had received one of DHHS' letters and immediately contacted the GAL. At that time, Jonathan had already been in out-of-home placement for 10 months, but Zachary was still placed with Tabatha. In September 2020, Barton traveled to Nebraska but did not obtain employment or establish residency. Barton testified that during the time that he was in Nebraska, he lived in hotels, motels, or in his vehicle. Larson testified that Barton expressed uncertainty to her about establishing residency in Nebraska.

After requesting to intervene and being offered voluntary services, Barton began participating in family support services and supervised visitation with Zachary. Larson testified that Barton regularly kept in contact with her during the pendency of the case. During one meeting with Barton, Larson asked Barton why he had been absent in the children's lives the past 7 years and Barton indicated that during his incarceration, Tabatha left Colorado with the children. Barton told her that after he was released in January 2014, he did not know where Tabatha and the children were living and he could not leave Colorado due to parole restrictions. Although Barton eventually learned that Tabatha and the children had moved to Plattsmouth, Nebraska, he did not become involved in his children's lives until DHHS became involved in the case.

Larson testified that during the case she set case plan goals for Barton in order to help him progress through the case and reunify with his children. Barton's case plan goals included completing an initial diagnostic interview (IDI) to determine any mental health diagnoses and

treatment plans. Larson testified that she also became concerned regarding Barton's possible substance use. On January 21, 2021, Barton was arrested in Nebraska for driving under the influence (DUI) which resulted in the cancellation of one of his visits with Zachary. In May 2021, following the adjudication and disposition, Barton returned to Colorado to voluntarily complete an IDI and a psychological evaluation.

According to Larson, the IDI recommended that Barton attend AA/NA meetings and maintain sobriety. According to the psychological evaluation, which was offered into evidence during the termination hearing,

[Barton's] performance on this assessment placed his overall level of intellectual functioning in the Borderline Range with a Full Scale IQ score of 70. His performance equaled or exceeded only 2% of his peers. . . individuals with this condition require more concrete and detailed instruction for a task before they can complete it, but can perform daily tasks with minimal supervision. They often have a very low tolerance for frustration and often have behavioral problems. Other common symptoms include poor attention span, poor concentration, mood swings, and poor judgment.

The psychologist also provided that Barton was "a concrete thinker," that he was a high risk for relapsing with alcohol abuse, and that it was unlikely he would benefit from any additional inpatient or outpatient substance abuse disorder (SUD) treatment, but the psychologist strongly encouraged Barton to participate regularly in AA meetings to help maintain his current reported sobriety.

In diagnosing Barton with alcohol use disorder, moderate, in reported early remission and borderline intellectual functioning, the psychologist instructed that:

Those who interact with [Barton] around legal and custody issues need to keep in mind that [Barton] has a diagnosis of Borderline Intellectual Functioning. He is able to read at approximately the tenth grade level, but may struggle with understanding legal mandates. He is a concrete thinker and may struggle with cause and effect or abstract thinking. He tends to make decisions on emotions rather than rational thinking.

Although the evaluation indicated that Barton was at a high risk of relapsing and recommended AA/NA meetings, Barton did not provide Larson with proof of attendance at any time during the case.

In a conversation with Larson while Barton was staying in Nebraska, Barton indicated to Larson that he desired to have placement of both Jonathan and Zachary. Larson testified that Barton had mentioned that he wanted to move the children to Oklahoma with him as he already had a residence there. Larson informed Barton that he would need to be established in Oklahoma before she could consider placement of the children with him in that state.

(b) Barton's Move to Oklahoma

In June 2021, Barton moved to Oklahoma due to health complications and his ineligibility for Medicaid or insurance in Nebraska because he was not a Nebraska resident. After moving, Barton remained in contact with Larson and expressed that he wanted to see Zachary on a regular basis and would make a return trip to Nebraska every 3 weeks. Despite this statement, Larson

testified that Barton's visits did not occur every 3 weeks, but instead corresponded with juvenile court dates and Zachary's birthday.

Throughout the entirety of the case, Barton participated in eight scheduled supervised visits with Zachary, but Jonathan refused to participate in visits. Larson explained that Jonathan knew Barton better than Zachary did before Barton had become involved in the case, and that it was generally reported that visits between Zachary and Barton went well. However, a visitation worker noted in an October 2022 visitation report that Barton was "super wound up" about the court issues and had to be redirected a few times about appropriate conversations with Zachary. After the final redirection, the worker noted that the rest of the visit went well.

Barton testified that after he moved to Oklahoma, he requested that the State consider placing Jonathan and Zachary with him in Oklahoma. Barton subsequently filed a motion on August 16, 2021, requesting that the court order the State to complete the ICPC process to determine if placement with him in Oklahoma was an option. Barton also filed a motion requesting that Jonathan and Zachary be placed in his care. A hearing on the motions was held in September 2021. The court denied Barton's motion for placement but granted his motion related to the ICPC and ordered DHHS "to complete ICPC paperwork and process it through State of Oklahoma forthwith. No further delay is acceptable."

(c) ICPC

Following the State's request for a home study of Barton's Oklahoma residence, Oklahoma returned the ICPC and a home evaluation in April 2022. The ICPC indicated no safety threats as the children "are older and less vulnerable." However, the Oklahoma Department of Human Services (OKHHS) recommended a denial of the home study until certain conditions were met including that:

 • Barton would have bedroom furniture and all necessities for the children prior to placement;

 • Barton would work with Nebraska to establish family and individual counseling for him, Jonathan, and Zachary and that Barton would follow recommendations on transition services for the children and parenting services for him;

 • the children agree to the placement with Barton and have an established relationship with him;

 • Barton would complete a drug and alcohol assessment and follow the recommendations;

 • for the duration of the case, Barton would allow Oklahoma Foster Care and Permanency Planning ongoing access to the children and his home upon placement; and

 • DHHS and the court clearly outline, and consistently repeat, rules of placement and visitation to Barton. Upon the conditions being met, Nebraska could request reconsideration for placement within 90 days, otherwise a new ICPC would have to be completed.

After receiving the ICPC, Larson relayed the information to Barton. Initially, Barton refused to participate in a drug and alcohol evaluation, indicated that the house in Oklahoma was already fully furnished and ready for the children, and expressed that he was unwilling to

participate in individual or family counseling. Larson also stated that the children did not agree to placement in Oklahoma and that Jonathan still refused to participate in any visitation with Barton. Larson testified that DHHS attempted to help Barton achieve the recommendations that they could help him achieve. For example, Larson stated that DHHS did not have the ability to pay for an out-of-state drug and alcohol evaluation, but that she spoke with Barton about completing a drug and alcohol evaluation in Nebraska. Barton expressed that he was unwilling to do so at that time and further indicated that he no longer wanted to be a part of the case. According to Larson, Barton expressed that he was done participating in the case on at least ten occasions. Barton did not complete any of the recommendations within 90 days although he did eventually complete the drug and alcohol evaluation in October 2022.

The results of the drug and alcohol evaluation indicated that Barton was defensive and angry throughout the assessment and indicated that Barton believed the evaluation was stupid. Larson submitted the completed evaluation to Oklahoma, but because Barton failed to complete the evaluation within 90 days, Barton was required to restart the entire ICPC process. Larson testified that she did not take steps to restart the ICPC process because Barton argued "as to why he should not do those things . . . or he would state that he wasn't going to do them." Larson testified that Barton continuously referred to the case as a "circus," and that Barton was very resistant and did not recognize the importance of therapy for himself or the children. Barton indicated that although individual therapy was discussed with him in connection with the ICPC, he did not participate in individual therapy because it was not ordered by the court, it was not covered by his insurance and would cost him $250 per session, and because the case primarily involved Tabatha.

(d) Therapeutic Services

Larson testified that during the case, both children had ongoing needs that required mental health services including individual therapy, family therapy with Tabatha, and family therapy with Barton. Zachary's therapist for individual sessions was Joyce Hicks. Although Hicks was not Jonathan's therapist for individual therapy, she facilitated approximately 10 family therapy sessions with Zachary, Jonathan, and Tabatha. After the April 2021 dispositional hearing, the court ordered Barton to engage in family therapy with Jonathan and Zachary, but the family therapy was not initially arranged by DHHS because Jonathan refused to participate.

*(i) Jonathan's Individual Therapy*

Jonathan participated in only one family therapy session with Barton, which was completed prior to December 2021 and was facilitated by his individual therapist. This therapist ceased providing individual therapy with Jonathan in December 2021 and Jonathan did not resume individual therapy until April 2022.

*(ii) Zachary's Individual Therapy*

In mid-2021, Zachary began participating in individual therapy with Joyce Hicks. After completing an IDI, Hicks diagnosed Zachary with adjustment disorder. Because Zachary was having "significant aggression behaviors, acting out, fighting in school, [and] not doing very well in school academically," Zachary's treatment goals focused on "improving his behaviors,"

managing his emotions, and learning how to express his emotions in a healthier way. In June 2022, Hicks drafted a letter indicating that Zachary had been making progress with his treatment goals and that his progress was inconsistent which was not unusual. At the time of trial, Hicks testified that Zachary "absolutely continued to improve" and that he can "express his feelings verbally without acting out nine out of ten times."

### (iii) Family Therapy With Barton

Hicks testified that initially Jonathan was "adamant that he did not want to have any kind of family therapy session with [Barton]" because they had not had a good relationship and he felt that his relationship with Barton would not change. Similarly, Zachary stated that "he doesn't really know [Barton]" and because of this, he did not want to have family therapy sessions with Barton. Both Jonathan and Zachary eventually agreed to participate in a family therapy session with Barton. Hicks testified that Zachary did not indicate what he hoped to get out of the family session, but Jonathan indicated that he wanted to be able to vocalize his feelings. The second family therapy session between Barton, Jonathan, and Zachary was scheduled to take place on the same date as the termination hearing.

### (iv) Hicks' Opinion Testimony

Although Hicks indicated that she believed that both parents needed to participate in family therapy prior to unsupervised visits taking place, she informed Larson that she would be unable to accommodate family therapy sessions between Jonathan, Zachary, and Barton. Hicks did not provide an opinion on whether termination was in Zachary or Jonathan's best interests, but she generally testified that she believed it was important for children to have permanency and not be in foster care for prolonged periods of time.

### (e) Testimony Regarding Best Interests

Larson testified that she believed it was in the children's best interests that Barton's parental rights be terminated because:

> They don't really know Barton. Zachary has had a total of eight visits. Jonathan has had one. Barton has told me on several occasions that he believes that Jonathan would be best off in the barn with a shovel dealing with his behaviors. When setting Barton up with therapy and such, he's very resistant. The children need therapy. Barton has also stated on several occasions that his plan would be to regain custody of the children and possibly move them and Tabatha back to Oklahoma, which is not in the children's best interest.

### 4. COURT ORDER

Following the close of the evidence, in finding that termination was in the children's best interests, the court stated that although Barton had participated in the case and exercised visitation to some extent, he had failed to provide a suitable residence or support for either child. The court stated that Barton

> was living in his vehicle, though he always had a home in Oklahoma. He had also not been involved in his children's lives for approximately seven years before the case began. Most

of his supervised visits with Zachary have occurred or been coordinated around the juvenile court dates for this case. He indicated a desire to have the kids move to Oklahoma.

Additionally, the court stated that Barton was initially unwilling to complete a drug and alcohol screening but later indicated he would complete it but would not pay for it. Then, after completing the evaluation in October 2022, it was too late for the ICPC claim to be processed. The court also noted that Barton claimed to have fully furnished his Oklahoma residence for his children, but then said the furniture for the kids was "in storage." The court also noted that Barton initially refused to comply with any family counseling or therapy "but changed his tune around June of 2021," and "[n]either of his boys wanted to complete any therapy with him." The court stated that Barton also refused to complete any individual therapy on his own and

[a]t least ten times throughout this case, [Barton] told the case worker of [DHHS] that he was "done" and would not participate with any services. He has expressed his unwillingness to "jump through hoops" and has called the court process and [DHHS] a "circus." The court shares the concerns listed by [OKDHS] in the ICPC that [Barton] likely has not been honest regarding his criminal history and drug use. His children have continuing needs for therapy and services, and [Barton] is clear about his "old school" approach which shuns therapy in favor of hard labor. His testimony reflects that he thinks the case is not about him, since the boys were removed from their mother, not from his care, and he does not grasp his children's therapeutic needs and need for permanency.

While [Barton] has been able to get to know Zachary to some extent through supervised visits, he has no relationship with Jonathan, who refused throughout the case to make any attempts at a relationship with [Barton].

[Barton] is an unfit parent, and the best interests of [Zachary and Jonathan] dictate that the parental rights of [Barton] be terminated. [Barton] had no prior relationship with these children, and since his court involvement with this case over the course of two-and-a-half years [he] has been unable to place himself in a position to adequately, consistently, and safely parent his children despite efforts made by [DHHS] and the court to enable him to do so.

Barton now appeals from the order terminating his parental rights to Jonathan and Zachary.

## III. ASSIGNMENTS OF ERROR

Barton assigns that the court erred in (1) finding sufficient evidence to support an order terminating his parental rights to the minor children under § 43-292(2) and (7); and (2) finding sufficient evidence to conclude that the termination of his parental rights was in the minor children's best interests and finding that he was an unfit parent.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). However, when the evidence is in conflict, an appellate court

may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## V. ANALYSIS

### 1. STATUTORY GROUNDS FOR TERMINATION

Barton first assigns that the court erred in terminating his parental rights because the State failed to prove by clear and convincing evidence that one or more of the statutory grounds existed to support termination.

The grounds for terminating parental rights are codified in § 43-292. Any of the 11 separate subsections of § 43-292 can serve as a basis for termination when coupled with evidence that termination is in the best interests of the child. *In re Interest of Denzel D., supra*. The State has the burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Denzel D., supra*.

As relevant to this appeal, § 43-292(7) allows for termination when "the juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." "[O]ut-of-home placement" as used under § 43-292(7) is to be considered from the perspective of the parent whose parental rights are at issue and that therefore, "out-of-home placement" includes placement with anyone other than the parent at issue, including with another parent. *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023). The look-back period to determine the existence of the statutory basis under § 43-292(7) of 15 or more months of the most recent 22 months is to be determined as of the date the petition or motion for termination of parental rights is filed and any change in placement after the filing of the petition or motion is to be considered as part of the analysis of parental fitness and the best interests of the child. *In re Interest of Jessalina M., supra*. In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *Id*

Here, Jonathan has been in out-of-home placement since December 10, 2019, and Zachary has been in out of home placement since January 27, 2021. At the time that the State filed the petition for termination of Barton's parental rights on July 26, 2022, Jonathan had been in out-of-home placement for 21 months and Zachary had been in out-of-home placement for 17 months. And although Barton argues that the removal of the children from their mother's care and the delay in the ICPC should not count against him, § 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. See *In re Interest of Kenna S.,* 17 Neb. App. 544, 766 N.W.2d 424 (2009).

In sum, because both children had been in out-of-home placement for 15 or more months of the most recent 22 months, we find that the court did not err in finding that statutory grounds existed for termination of Barton's parental rights under § 43-292(7). Having made this determination, we need not further address the sufficiency of the evidence to support termination under any other statutory ground. See *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019) (if appellate court determines that lower court correctly found that termination of parental rights is appropriate under one of statutory grounds set forth in § 43-292, appellate

court need not further address sufficiency of evidence to support termination under any other statutory ground). This assignment of error fails.

## 2. Best Interests

Barton next assigns that the court erred in finding that the State proved by clear and convincing evidence that it was in Jonathan and Zachary's best interests to terminate his parental rights and in finding that he was an unfit parent. Specifically, Barton argues that the State's evidence focused on Barton's perceived personal shortcomings as opposed to what was in the children's best interests.

In addition to proving at least one statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *Id*. There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id*. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id*.

The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the child's best interests. *Id*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's well-being. *Id*. The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id*.

Termination of parental rights is a final and complete severance of the child from the parent and removes the entire bundle of parental rights. *In re Interest of Destiny H. et al.*, 30 Neb. App. 885, 974 N.W.2d 343 (2022). Therefore, with such severe and final consequences, parental rights should be terminated only in the absence of any reasonable alternative and as the last resort. *Id*. The law does not require perfection of a parent. *Id*. Instead, we should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *Id*. Whereas statutory grounds are based on a parent's past conduct, the best interests inquiry focuses on the future well-being of the child. *Id*.

Here, the State argued that the evidence showed that termination was in the children's best interests because: Barton was absent for a 7-year period before becoming involved in the case in September 2020; he mentioned at least 10 times that he was done participating in the case; he was initially unwilling to follow through with the recommendation to complete a drug and alcohol evaluation and, when he did decide to complete it, it was past the 90-day time limit required by OKDHS; he had not made substantial progress with the case plan; and although he indicated a willingness to work with DHHS for reunification, Barton wanted to proceed on his own timeline.

Further, the State offered evidence indicating that Zachary and Jonathan had been in out-of-home placement for over 15 months; that Barton had only 8 visits with Zachary and had to be redirected about appropriate conversation; and Barton refused to comply with the terms of the Oklahoma home study which could have given Barton an opportunity to have the children placed

with him and work towards reunification or family preservation. The State argued that the evidence supported a finding that Barton was an unfit parent and that the children should not have to linger in foster care. We agree.

Based on our review of the record, we find that the State's evidence clearly and convincingly establishes that Barton is an unfit parent and that termination is in the children's best interests. It is apparent that throughout the case Barton refused to comply with the court orders, the case plan goals, and the home study recommendations in order to put himself in a position to regain custody of his children. Barton, on at least ten occasions, indicated that he no longer wished to participate in the case because he did not feel the need to "jump through hoops" because the case was not about him. Barton refused to address his substance abuse issue and was cited for DUI in the short time period he was in Nebraska. And despite being given a 90-day window to complete a substance abuse evaluation for the ICPC, Barton initially refused, and when he did complete the evaluation, he failed to do so within OKDHS' 90-day time limit. Additionally, Barton was defensive with the evaluator, failed to provide important information, and was not honest regarding his alcohol use.

Further, based on the record, it is clear that Barton does not accept responsibility for his strained relationship with Zachary and Jonathan. Throughout the case, Jonathan continuously refused to participate in visits with Barton and, although Zachary engaged in visits, he stated on multiple occasions that he did not really know Barton. Barton consistently blamed his lack of contact with Zachary and Jonathan during the 7 years preceding their removal on Tabatha and on the children moving from Colorado to Nebraska. Then, after the children were removed, he placed the blame solely on Tabatha and stated multiple times that he did not feel the need to complete recommended services because this case did not involve him. Although the law does not require perfection of a parent, we must look to the continued improvement and substantial compliance with the court orders, as well as the relationship with the children. *In re Interest of Destiny H. et al.*, 30 Neb. App. 885, 974 N.W.2d 343 (2022).

Here, we find that Barton failed to adequately progress in achieving the case plan goals and recommendations in order to provide permanency to his children. Furthermore, the record shows that Barton did not have a beneficial relationship with either Jonathan or Zachary at the time of the termination hearing. From our de novo review of the record, we cannot find that Barton will put himself in a position to care for his children in the reasonably foreseeable future, and children cannot, and should not, be suspended in foster care or be made to wait uncertain parental maturity." *In re Interest Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). Therefore, we find that the court did not err in finding that Barton was unfit, and that termination of Barton's parental rights was in Jonathan and Zachary's best interests.

## VI. CONCLUSION

Because we find that statutory grounds for termination existed and that the evidence was sufficient to support a finding that termination was in the best interests of the children, we affirm.

AFFIRMED.