IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF ELIJAH Y. ET AL.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF ELIJAH Y. ET AL., CHILDREN UNDER THE AGE OF 18.

STATE OF NEBRASKA, APPELLEE,

V.

SAMUEL Y., APPELLANT.


Filed May 21, 2024.    No. A-23-821.


Appeal from the Separate Juvenile Court of Lancaster County: ELISE M.W. WHITE, Judge. Affirmed.

Heather S. Colton, of Pollack & Ball, L.L.C., for appellant.

Patrick F. Condon, Lancaster County Attorney, and Tara A. Parpart, for appellee.


MOORE, ARTERBURN, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Samuel Y. appeals the termination of his parental rights to his four minor children. He contends that the juvenile court erred in terminating his parental rights pursuant to Neb. Rev. Stat. § 43-292(2) and (6) (Reissue 2016) and erred in finding that termination was in the minor children's best interests. For the reasons set forth herein, we affirm.

- 1 -

## II. STATEMENT OF FACTS

### 1. BACKGROUND

Samuel is the natural father of Joseph Y., born in October 2014; Suzanna Y., born in November 2015; Elijah Y. born in September 2017; and Rebecca Y., born in December 2021. The natural mother is not part of this appeal and will only be mentioned as necessary for context.

Initially, this case arose due to domestic violence and was voluntary for approximately 6 months. During the voluntary portion of the case, the family received services including family support in the home, a safety plan, and therapy for the children. However, the case later became involuntary due to concerns of inappropriate discipline and physical abuse of the children by Samuel and due to Joseph expressing a desire to harm himself because of his home environment. Joseph, Suzanna, and Elijah were removed from their parents' custody on October 15, 2021. The youngest child, Rebecca, was removed from her parents' custody on December 30. Joseph, Suzanna, and Elijah are placed with the same foster family and Rebecca was placed with a different foster family. The children have remained in out-of-home placement during the entirety of this case.

On October 18, 2021, the State filed a petition for adjudication which was subsequently amended to allege that the children came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) in that the minor children lacked proper parental care by reason of the fault or habits of Samuel and were in a situation dangerous to their life or limb or injurious to their health or morals based upon Samuel having engaged in threatening, intimidating, and/or aggressive behaviors, and/or inappropriate physical discipline towards one or more individuals in the family home while one of said juveniles was present or nearby between specified dates; Samuel being unable and/or unwilling to provide treatment, services, and/or supervision to some or all of the juveniles; and Samuel's failure to provide a safe home environment; and that, as a result, the juveniles are at risk of harm. The juvenile court adjudicated the minor children in early February 2022 based upon Samuel's admission to these allegations.

During the pendency of this case, Samuel was ordered to, among other things: maintain employment or other legal means of support; maintain regular contact with caseworkers; attend individual therapy; complete an initial diagnostic interview; complete a parenting assessment; complete a parenting class; complete a Batterer's Intervention Program; maintain a safe and stable home; participate in supervised visitation; participate in child parent psychotherapy (CPP) with Elijah; participate in therapeutic visitation; cooperate with family support services; and not engage in, and report, any involvement in threatening, controlling, or manipulative behavior, or physical altercation or aggression with any individual.

Efforts offered, or provided, to the family included structured decisionmaking (SDM) assessments; monthly home visits; an initial diagnostic interview for Samuel; parenting classes for Samuel; family support services; supervised parenting time; a Batterer's Intervention Program for Samuel; trauma assessments for Joseph and Suzanna; referrals for early developmental network (EDN) assessments for the minor children; individual therapy for Samuel, Joseph, Suzanna, and Elijah; efforts to arrange a CPP evaluation for Elijah; efforts to arrange intensive family preservation (IFP); implementation of safety plans; case management; a licensed foster home;

sibling visitation; and speech and occupational therapy for Elijah. Joseph, Ellijah, and Suzanna have participated in individual therapy and, due to her young age, Rebecca is on the waitlist for CPP.

## 2. Motion to Terminate Parental Rights/Termination Hearing

On May 25, 2023, the State filed a motion to terminate Samuel's parental rights pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016), and alleged that termination of parental rights was in the minor children's best interests. The termination hearing was held over 2 days in September 2023. Testimony was adduced from witnesses including Joseph; Jordan Graham, Joseph's therapist; and Olivia Christensen, Suzanna and Elijah's therapist. Evidence regarding Samuel's compliance with court orders was adduced from Addison Hillman, the caseworker assigned from March 2021 to mid-June 2022; Autumn Maynez, the caseworker since December 2022; and numerous exhibits including case plans and court reports.

### (a) Joseph's Testimony

Joseph, the oldest child, was the only child to testify during the termination hearing. Joseph testified that he had not seen Samuel in a long time because Samuel "was making some bad choices" and he did not want to see him anymore. Joseph testified to instances of abuse and reported that Samuel cursed in front of him and hit him with an open hand, a closed fist, and a belt. Joseph expressed that he stopped attending visits with Samuel because Samuel scared him and he was concerned that Samuel would hit him. Joseph stated that he would not change his opinion about refusing to see Samuel and that there was nothing that Samuel could do to make him want to see Samuel again because he was scared of him. Joseph further testified that he likes living with his foster family "a lot" and that he never wants to live with Samuel again.

### (b) Testimony of Children's Therapists

Each of the three oldest children, Joseph, Suzanna, and Elijah, participated in individual therapy. Joseph has been attending individual therapy with Jordan Graham since October 2022. Elijah and Suzanna have been attending individual therapy with Olivia Christensen since June 2022. All of the children initially began weekly therapy sessions but, as a result of their progress, Suzanna and Elijah now attend sessions on a biweekly basis. Joseph continued to attend therapy on a weekly basis.

#### (i) Jordan Graham Testimony

Graham testified that Joseph initially presented with angry outbursts, nightmares, lack of concentration, impulsivity, and inability to express his emotions without losing control. Graham diagnosed Joseph with post-traumatic stress disorder and AD/HD. Graham started cognitive behavioral therapy (CBT) with Joseph which she described as "focusing on how a situation can affect one's thoughts as well as behaviors, and their actions to the situation." After treating Joseph for several months, Graham switched Joseph's therapy to trauma-informed CBT "which is . . . like CBT but it works with the upsetting and confusing events that have happened and how to navigate those as well as how can he manage his emotions within triggers from that situation as well as just other situations that should be normal to children." Graham testified that

- 3 -

Currently, we're working on [Joseph's] trauma narrative which encompasses him being able to tell his story surrounding any of the traumatic events that he wants to, helping him manage his emotions and express them in appropriate ways, being controlled as well as identifying what different emotions are. We work on how to relax, [and] ground himself when triggers arise. We work on how he handles himself . . . out in the community, at school, at home, many of those things.

According to Graham, Joseph has had "ups and downs" and explained that

There were periods of time where [Joseph] was doing really well and then there were also periods of time where I was getting information that he was spending a lot of time outside of class, we were having some major outbursts . . . at school, sometimes some frustrating emotions at home, and that he wasn't able to kind of express what he was feeling so that was the frustrating part for him.

Additionally, Graham testified that "most recently as school has gotten out there's been a lot of progress being made" and that Joseph has not seen Samuel since school ended. And although Graham did not have an anticipated discharge date for Joseph, her plan was to maintain Joseph's "goals and objectives and continu[e] to increase his progress."

*(ii) Olivia Christensen Testimony*

According to Christensen, Suzanna initially presented with anxiety-related symptoms, hypervigilance, and she refused to talk about her mental health or events in her life. Christensen diagnosed Suzanna with unspecified trauma and stressor-related disorder. Christensen engaged Suzanna in play therapy and trauma-focused cognitive behavioral therapy (TFCBT), which is therapy for children "who have experienced any type of trauma" and "helps with emotion regulation, . . . identifying how to calm their body down, mindfulness," and having a safe space to talk when the child is ready. Since working with Suzanna, Christensen testified Suzanna exhibits less anxiety-related symptoms, she seems to be engaged in play, she is able to have more conversations about what she is feeling, and she notices and identifies her body symptoms and feelings, including noticing when she gets angry or upset.

Christensen initially diagnosed Elijah with unspecified trauma and stressor-related disorder, but later changed that diagnosis to post-traumatic stress disorder (PTSD). Christensen described PTSD as "when a child has described or witnessed a traumatic event, they have prolonged exposure, continued symptoms related to hypervigilance, anger, frustration for children, any type of heightened emotions, things like that." Because Elijah was younger and his presenting problems consisted of aggressive play, she used TFCBT and more play therapy techniques to work on vocalization and expressing his feelings. Christensen testified that Elijah is

an amazing kiddo. He has really learned to identify not only his feelings but how it feels in his body, so we talk a lot about anger, frustration, sadness, and what that feels [like], and he's really able to identify when in the moment he feels that which is really, really cool for him.

### (c) Samuel's Compliance/Noncompliance With Court Orders

#### *(i) Compliance*

The evidence established that Samuel complied with court orders requiring him to maintain employment; maintain regular contact with caseworkers; and complete an initial diagnostic interview. And, although Samuel was ordered to attend individual therapy, he did not do so until June 2023, after the State had filed the motion to terminate his parental rights. Additionally, Samuel completed a parenting assessment but was only able to complete the child-parent observation portion of that assessment with 1-year-old Rebecca because the three older children refused to participate. During the observation with Rebecca, Samuel did not bring food, activities, diapers, or wipes.

#### *(ii) Participation But Failure to Change Behavior*

Although Samuel participated in certain other court-ordered requirements, the evidence established that he either failed to demonstrate changes in viewpoint or the ability to implement what he had learned.

#### a. Parenting Class

Although Samuel completed a parenting class, Graham reported that Samuel stated that "he was still going to parent in the way he felt was necessary."

#### b. Batterer's Intervention Program

Even though Samuel completed a Batterer's Intervention Program, case managers reported that he was still using physical discipline; he still displayed manipulative and controlling behaviors; and he was not implementing lessons regarding domestic violence, power, and control. The most recent case manager, Maynez, explained that part of the Batterer's Intervention Program

> is not just learning the material or being able to understand the material but actually [being] able to implement that in their everyday lives, whether that's in a romantic relationship, a professional [relationship], whatever the case may be, or even just with their children. Since that has happened, [DHHS] has not seen anything that would suggest [that Samuel] is actually using any of the knowledge he would have gained in this class.

#### c. Maintain Safe and Stable Home

Although caseworkers admitted that Samuel had appropriate housing, Maynez testified that Samuel has denied responsibility that his actions led to the opening of the DHHS case. Further, Samuel admitted to "spanking Joseph using a belt on his hands, his legs, the back of his legs, as well as on his stomach," but when informed that such behavior was inappropriate, Samuel "responded with the fact that he was raised differently, and he was going to raise his children how he was raised and nobody can tell him differently." Maynez opined that, due to Samuel's behaviors, he was unable to provide a safe and stable home for the children.

### d. Supervised Visitation

The evidence established that Samuel participated in visitation with the minor children, however, there were many issues with his participation. Visitation agencies had to be changed after one company discharged him due to concerns regarding Samuel's behavior and missed visits. And caseworkers noted that during visits, Samuel spent a significant period of time on his phone, spent little time interacting with the children, failed to give the children physical affection, and, during one visit, he yelled at Joseph and threatened Joseph with physical violence which scared Joseph.

Samuel's supervised visits were suspended in January 2023 after DHHS received reports of Samuel abusing the minor children. Since that time, Samuel has not resumed visits with Joseph, Suzanna, and Elijah, because they refuse to attend. However, at the time of the termination hearing, Samuel was still participating in a 2-hour weekly supervised visit with Rebecca, but those visits had been limited due to "some parenting concerns that had arisen during [his] parenting time" and due to "manipulative, intimidating, and controlling comments [Samuel] has made during visits as well as the fact that there was [an] inappropriate relationship with [Samuel's] previous supervision visitation worker." Samuel's visits never progressed beyond supervised visits during the entirety of this case.

### (iii) Noncompliance With Court Orders

Samuel failed to comply with court orders requiring him to participate in CPP with Elijah; to participate in therapeutic visitation with Joseph, Suzanna, and Elijah; to cooperate with family support services; and to not engage in threatening, controlling, or manipulative behavior or physical altercation or aggression.

### a. Child-Parent Psychotherapy

Samuel failed to comply with the court order requiring him to participate in CPP with Elijah. CPP is for children under 5 years old with the goal of rebuilding relationships, building emotional regulation, and creating safety and security within the child's relationship with each caregiver. Christensen testified that, although Samuel completed an initial meeting with her, he failed to contact her to complete the CPP assessment.

### b. Therapeutic Visitation

Samuel also failed to comply with the court's order to participate in therapeutic visitation with Joseph, Suzanna, and Elijah.

### i. Joseph

Graham testified that she spoke with Samuel in May 2023 to ensure that he understood the reasoning behind therapeutic visitation and to discuss parenting and some of the situations that had arisen during supervised visits. During the visit, Samuel acknowledged that he had physically abused Joseph and stated that "he would [hit Joseph] again if the situation arose that Joseph would lie." According to Graham, Samuel "stated that within his culture and the way that he handles lying that he would do the same exact physical violence again to Joseph because that showed Joseph how he does not tolerate lying about himself or about others."

According to Graham, Samuel never took responsibility for the reasons that the case became court-involved and Samuel indicated that the reason DHHS and the court was involved was because "Joseph lied."

Although Samuel admitted to physically abusing Joseph, Samuel "could not state why [his actions] were inappropriate or . . . wrong and different ways that he could have handled that situation." Regarding one of the reported incidents of abuse, Samuel explained that the incident related to actions that he took "for health purposes."

After meeting with Samuel, Graham determined that therapeutic visits were not in Joseph's best interests and could not occur "[d]ue to Samuel not fully accepting that what he did to Joseph in those situations was not okay and he could not describe or state a plan . . . on how he would manage Joseph's emotions as well as his own emotions within certain incidents." Graham testified that in order for her to reconsider her decision not to recommend therapeutic visits, Samuel would need to have a plan on how to help Joseph manage Joseph's emotions and how to help Joseph become comfortable with visits and their relationship, Joseph would have to be willing to have therapeutic visits, and they would need to have an additional session to have a more in-depth discussion regarding the necessity of Samuel having a plan in place on how to maintain Joseph's safety and security. Graham testified that she did not believe that Joseph will be ready for therapeutic visits with Samuel in the near future because he "has stated he does not feel safe or comfortable to have therapeutic visits."

### ii. Suzanna and Elijah

Christensen met with Samuel several times via videoconferencing regarding starting therapeutic visits with Suzanna and Elijah. However, therapeutic visits never commenced because Christensen determined that therapeutic visits were not in the children's best interests. Christensen explained that Samuel would not acknowledge how his actions caused fear in the children and both Suzanna and Elijah expressed that they did not feel safe meeting with Samuel and did not want to have any contact with him.

### c. Cooperate With Family Support Services

Samuel also did not comply with the court orders to cooperate with family support services. Maynez explained that family support could assist with goals ranging

> from helping with employment whether they currently have employment or maybe need to switch to adjust for something that would be a better fit for even their schedule or their kids' schedules, housing if that's a problem, maintaining or obtaining resources that are out in the community, possibly even transportation if the family doesn't have any kind of transportation. It can help with those kind[s] of things, as well as really just being another support person for them.

However, according to Maynez, Samuel "indicated that he didn't feel family support would be beneficial to him" and "that he did not need that help and he can take care of his family on his own."

### d. Not Engage in Threatening, Controlling, Manipulative Behavior or Physical Altercation/Aggression

Samuel also failed to comply with the court order providing that he was not to engage in threatening, controlling or manipulative behavior or physical altercation or aggression. According to Maynez, Samuel did not want to discuss educational decisions because "it was women's work, and he doesn't deal with that," and he attempted to use intimidation tactics on DHHS workers including standing in front of the door to his home blocking workers from leaving, attempting to talk over others or control conversations, and raising his voice during conversations.

### (d) Best Interests

There was a significant amount of testimony presented regarding the children's best interests from Maynez, Graham, Christensen, as well as evidence contained in the case plans and court reports that were received into evidence.

### (i) Maynez

Maynez testified that having a safe and stable home is in a child's best interests, and specifically in Joseph, Suzanna, Elijah, and Rebecca's best interests because

> Children who have . . . safe and stable homes feel that they are safe and stable and are able to express themselves, express [the] way they are feeling, and know that even if [there are] situations that may or could arise in the future, knowing that it is either an unsafe or maybe a scary situation they have go this place where they can essentially come home to that not only looks like a home but feels like a home, and be able to thrive within those safe and stable environments.

She further testified that it is children's best interests, and specifically in Joseph, Suzanna, Elijah, and Rebecca's best interests, to have permanency because

> It has been shown that children who receive permanency are able to overcome the fears of the unknown. . . . we have seen a lot of children that . . . don't have permanency or in a sense have a question mark when it comes to permanency, they have a lot more fear of the unknown as well as trouble adjusting where they may end up being actually diagnosed with those adjustment disorders that do make it a little harder for them just growing up throughout life, so being able to achieve that permanency would be in their best interest[s].

Maynez testified that she has never been able to recommend that any of the children return to Samuel's care and that she did not foresee being able to reunite the children with Samuel at any time in the near future. She further testified that it was not in the minor children's best interests to linger in foster care because the

> goal for [the children] is to be able to find permanency as soon as possible in a safe and stable environment where they can thrive, where they . . . feel safe, and remaining in foster care would essentially leave these children in limbo, for lack of better words, without knowing what comes next.

She opined that termination of Samuel's parental rights was in Joseph, Suzanna, Elijah, and Rebecca's best interests and that if the children were returned to Samuel's care, "they would be at risk of harm, danger, and potentially emotional and physical trauma passed what they currently have."

### (ii) Graham

Graham testified that based on her training, education, experience, and knowledge regarding children's need of permanency, permanency was in Joseph's best interests because

> For a child to have permanency it's to be able to help them have a secure attachment with a loving, caring caregiver as well as have a sense of belonging within some type of relationship whether that be a family one, a social one, and having permanency creates a safe and stable environment for them to be able to do that and increase their optimal physical and emotional health.
>
> . . . .
>
> To have a secure attachment . . . leads to more open trust as well as having [Joseph] be able to manage himself better emotionally and physically, as well as creating positive social development which is crucial within children and their develop[ment].

Graham testified that Joseph has a secure attachment to his foster mother because
Before visits Joseph is often either sitting next to his foster mom playing games or they're reading together whether it's the "I Spy" books that I have up there or just other books. After visits, Joseph goes straight to his foster mom . . . just for acknowledgement and recognition, kind of coming back to that safe environment which it's permanent attachment that they're able to go explore as well as come back knowing that they have a secure base, and that just shows that he's willing to go in and have that secure base there of just open arms and they are able to have conversations and discuss things.

### (iii) Christensen

Regarding Suzanna and Elijah, Christensen testified it was in their best interests to have permanency. She testified that all children deserve to have permanency because it "creates safety, security for them, knowing especially when children are removed that they have a home, [and] caregivers that are gonna love and care for them." And if children are unable to achieve permanency, "[f]or children who experience trauma, typically you'll see increased mental health symptoms, sometimes you'll see more worries regarding how they are going to feel safe, that kinda can come up often if permanency is not created."

### (iv) Elijah's Foster Mother

Although Elijah's foster mother did not testify at the termination hearing, exhibits admitted into evidence included a report indicating that when Elijah was initially placed in her care, he was

nonverbal, but that he had shown a lot of improvement and was now able to recognize letters, read books, and verbalize his wants and needs.

### 3. TERMINATION ORDER

Following the termination hearing, the juvenile court terminated Samuel's parental rights pursuant to § 43-292(2), (6), and (7), and found that termination was in the minor children's best interests. The court found that despite the services provided to Samuel, he

> Was unable to make adequate progress to put himself in a position where any DHHS worker assigned to the family could recommend anything less intensive than supervised visits with his children. [Samuel] continued to make "fair" progress in [DHHS'] estimation, based on his attendance with services, but failure to make any meaningful changes which would indicate that he had gained any of [the] intended benefit from the services themselves. Following the investigation of allegations of additional physical abuse in February/March of 2023, (which were not adjudicated), [Samuel's] parenting time was suspended temporarily, then was ordered to be therapeutically supervised. . . . Christensen and . . . Graham both testified that they could not advise that moving forward with therapeutic visits was in their respective clients' best interests, as [Samuel] was not able to acknowledge the violence that had occurred in the home that was adjudicated, the trauma that the children had suffered as a result, or acknowledgement of his part in what happened. As a result, neither therapist believed therapeutically supervised parenting time was in the children's best interests or appropriate until [Samuel] was able to identify and articulate the trauma that the children had experienced, which was necessary for progress to be made. In essence, despite years of involvement with DHHS and services under the direction of the Court, [Samuel] has not been able to put himself in a position to safely parent his children.

The court further found that although Samuel successfully completed a Batterer's Intervention Program and was able to articulate what he had learned, "[h]e was never willing or able to acknowledge that his actions that were adjudicated were domestic violence" and he "continued to display a pattern of coercive control and actions that harmed the children." The case plans and court reports documented that Samuel continued to engage in behaviors of ongoing coercive control including threats, intimidation, financial control, and emotional abuse. And Maynez testified that Samuel "continued to attempt to intimidate her in her interactions with him, continued to blame [Hillman, a previous case worker,] for his families' involvement in juvenile court, and had engaged in an inappropriate sexual relationship with a visitation worker assigned to the case." Additionally, the court found that

> [t]he Case Plans and Court Reports also repeatedly documented that [Samuel] failed to actively engage his children during parenting time; spending time on his phone instead, and would also fail to provide food, diapers, and other items necessary to meet his children's needs during the time he spent with them. [Samuel] also failed to follow through on scheduling appointments, and following the recommendations of both of his children's mental health providers . . . in order to engage in Child Parent Psychotherapy or family

- 10 -

therapy/therapeutic parenting time to help address the trauma that his children suffered as a direct result of his actions and behaviors.

And the court found that

The evidence adduced at trial indicates that the children need to have permanency. [Maynez, Graham, and Christensen] all testified that each of the children herein needs to have permanency established for their own physical, mental and emotional well-being. The evidence also indicates that [Samuel] is not in a position to meet his children's physical, emotional, or psychological needs, and is unlikely to make sufficient progress in the near future for it to be in the children's best interests to return to his physical care. It is of note that the Psychological Evaluation and Parenting Assessment conducted on [Samuel] as part of the Court's rehabilitative plan indicates that, "[t]here is a significant risk that he is unable to make informed, timely, and competent decisions to adequately provide safety, structure, guidance and nurture to his children especially as the children mature." . . . Despite these services being in place, the marked parenting deficits still exist. The evidence presented through a variety of witnesses' testimony and exhibits offered confirm that [Samuel] has been unable or unwilling to perform reasonable parental obligations in child-rearing which have caused and probably will continue to result in detriment to his children's well-being. Of note was the testimony of his minor child, Joseph . . . which the Court found to be credible. Joseph testified that despite the services in place, including his own participation in therapy, he continued to be scared to even see [Samuel] and that there was nothing [Samuel] could do to make him not scared of [Samuel]. Joseph's fear of [Samuel] was acutely apparent during his testimony.

Samuel has timely appealed to this court.

## III. ASSIGNMENTS OF ERROR

Samuel contends that the juvenile court erred in terminating his parental rights pursuant to § 43-292(2) and (6) and in finding that termination was in the minor children's best interests.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## V. ANALYSIS

### 1. STATUTORY BASIS FOR TERMINATION

Samuel contends that the juvenile court erred in finding that the evidence was sufficient to terminate his parental rights pursuant to § 43-292(2) and (6). The juvenile court also terminated

- 11 -

Samuel's parental rights based upon § 43-292(7) and he has not alleged error regarding termination of his parental rights pursuant to this subsection.

The grounds for terminating parental rights are codified in § 43-292. Any of the 11 separate subsections of § 43-292 can serve as a basis for termination when coupled with evidence that termination is in the best interests of the child. *In re Interest of Denzel D., supra*. The State has the burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Denzel D., supra*.

As relevant to this appeal, § 43-292(7) allows for termination when "the juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." The look-back period to determine the existence of the statutory basis under § 43-292(7) of 15 of more months of the most recent 22 months is to be determined as of the date the petition or motion for termination of parental rights is filed and any change in placement after the filing of the petition or motion is to be considered as part of the analysis of parental fitness and the best interests of the child. *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023). Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Kenna S.*, 17 Neb. App. 544, 766 N.W.2d 424 (2009). In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *In re Interest of Kenna S., supra*.

Here, Joseph, Suzanna, and Elijah have been in out-of-home placement since October 27, 2021. Rebecca has been in out-of-home placement since January 1, 2022. At the time the State filed the petition for termination of Samuel's parental rights on May 25, 2023, Joseph, Suzanna, and Elijah had been in out-of-home placement for just under 19 months and Rebecca had been in out-of-home placement for 17 months. Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. See *In re Interest of Kenna S., supra*.

In sum, because all of the minor children have been in out-of-home placement for 15 or more months of the most recent 22 months, we find that the court did not err in finding that statutory grounds existed for termination of Samuel's parental rights under § 43-292(7). Having made this determination, we need not further address the sufficiency of the evidence to support termination under any other statutory ground. See *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019) (if appellate court determines that lower court correctly found that termination of parental rights is appropriate under one of statutory grounds set forth in § 43-292, appellate court need not further address sufficiency of evidence to support termination under any other statutory ground). This assignment of error fails.

### 2. BEST INTERESTS

Samuel next contends that the juvenile court erred in finding that termination of his parental rights was in the minor children's best interests.

In addition to proving at least one statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015).

A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *Id*. There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id*. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id*.

The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the child's best interests. *Id*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's well-being. *Id*. The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id*.

Termination of parental rights is a final and complete severance of the child from the parent and removes the entire bundle of parental rights. *In re Interest of Destiny H. et al.*, 30 Neb. App. 885, 974 N.W.2d 343 (2022). Therefore, with such severe and final consequences, parental rights should be terminated only in the absence of any reasonable alternative and as the last resort. *Id*. The law does not require perfection of a parent. *Id*. Instead, we should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. Id. Whereas statutory grounds are based on a parent's past conduct, the best interests inquiry focuses on the future well-being of the child. *Id*.

The evidence established that Samuel either failed to comply with the majority of court orders or failed to demonstrate changes in viewpoint or the ability to implement what he had learned. Although Samuel completed a parenting class, he stated that "he was still going to parent in the way he felt was necessary." Although Samuel completed a Batterer's Intervention Program, he still used physical discipline, displayed manipulative and controlling behaviors, and was not implementing lessons regarding domestic violence, power, and control. And, although Samuel did attend supervised visitation, he spent most of his time on his phone, he did not engage with his children, and he did not provide the children with physical or emotional affection. Samuel's visitation with his three oldest children was suspended in January 2023 due to reports of Samuel's physical abuse of the children, and visitation with Joseph, Suzanna, and Elijah never resumed because the children refused to attend visits. Further, although Samuel had appropriate housing, Maynez testified that due to Samuel's refusal to stop using physical discipline, he was unable to provide a safe and stable home for the children.

Throughout this case, Samuel has never acknowledged that his behaviors were the reason that DHHS was involved in the case. The State has made significant efforts in an attempt to provide support to Samuel so that he and the minor children could be reunited; however, despite those efforts, Samuel has not made any progress in being able to be reunited with his children since this case began in October 2021. Samuel has continually stated that "he does not believe that he has done anything wrong and everyone is out to get him."

Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Brooklyn T. &*

- 13 -

*Charlotte T.*, 26 Neb. App. 669, 922 N.W.2d 240 (2018). Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *Id.*

The evidence established that, due to sustained abuse by Samuel over the course of time, the three oldest minor children suffered from significant trauma resulting in the need for protracted therapy. The minor children have made progress but continue to attend therapy to address that trauma. Samuel has failed to acknowledge his responsibility for his children's condition and has refused to demonstrate a willingness to change while suggesting his conduct is an acceptable form of discipline. The minor children need permanency and it is clear that Samuel will not be in a position to provide permanency for the foreseeable future. Accordingly, we find that the juvenile court did not err in finding that Samuel was unfit and that termination of his parental rights was in the minor children's best interests.

## VI. CONCLUSION

Because we find that statutory grounds for termination existed and that the evidence was sufficient to support a finding that termination was in the best interests of the children, we affirm.

AFFIRMED.