IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF KAYSON K. & MELIDA K.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF KAYSON K. & MELIDA K., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ALEXIS R., APPELLANT.

Filed March 4, 2025.    No. A-24-574.

Appeal from the Separate Juvenile Court of Douglas County: AMY N. SCHUCHMAN, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Melinda Currans for appellant.

Alexis Homme, Deputy Douglas County Attorney, for appellee.

MOORE, BISHOP, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Alexis R. appeals from the termination of her parental rights to her minor children. She contends that the Douglas County Separate Juvenile Court erred in terminating her parental rights pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016) and determining that termination of her parental rights was in the minor children's best interests. For the reasons set forth herein, we affirm.

- 1 -

## II. STATEMENT OF FACTS

### 1. PROCEDURAL BACKGROUND

Alexis is the biological mother of minor children Kayson K., who was born in March 2009, and Melida K., who was born in March 2011. The record reflects that Melida prefers to be called Bella, so we use her preferred name in this opinion. Alexis had one other child who was initially involved in this case but has since reached the age of majority. The biological father of the minor children is not involved in this appeal and will only be referenced if necessary for context.

In January 2020, the Department of Health and Human Services (DHHS) received information that Alexis was incarcerated in Texas for assaulting a peace officer and that prior to leaving Nebraska, Alexis signed a temporary delegation of parental powers to an inappropriate caregiver who was living at a halfway house but was kicked out after admitting to using methamphetamine and marijuana and who did not ensure that the children's medical needs were being met. The children were removed from that caregiver on January 31. In a protective custody order filed on February 7, the court continued placement of the minor children with DHHS. The minor children have remained in out-of-home placement during the entire pendency of this case. Bella has been placed with Sydney Hirshberg during the entirety of this case. Kayson was also initially placed with Hirshberg, but was removed from this placement in May 2023, after Kayson physically assaulted Hirshberg while experiencing multiple mental health challenges. Kayson has been in four placements during this case.

On January 31, 2020, the State filed a petition for adjudication alleging that Kayson and Bella were children within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). On June 5, the juvenile court adjudicated the minor children based on Alexis' admission that she was incarcerated and that her incarceration placed the minor children at risk for harm. The court also found that it was in the minor children's best interests to remain in the temporary custody of DHHS for appropriate care and placement to exclude Alexis' home.

The first dispositional hearing was held over 2 days in July and August 2020. Other dispositional hearings and permanency check hearings were held in February 2021, May 2021, September 2021, November 2021, December 2021, February 2022, March 2022, July 2022, October 2022, February 2023, August 2023, and January 2024. During this case, the court ordered Alexis to participate in all requirements of her parole upon her release from incarceration; obtain and maintain a stable and legal source of income upon her return to Omaha, Nebraska, and provide written verification to DHHS on a monthly basis; obtain and maintain safe, appropriate, and adequate housing for herself and the minor children upon her return to Omaha and provide written verification to DHHS on a monthly basis; undergo a co-occurring evaluation upon her return to Omaha, as arranged by DHHS, sign a release of information so that the results can be obtained by DHHS, and follow all recommendations of the evaluation; submit to random urinalysis testing as directed by, and paid for, by DHHS and upon request, sign a release of information so that the results can be obtained by DHHS; participate in reasonable rights of agency-supervised virtual visitation; and notify the court, counsel, and DHHS, of any change of address and phone number within 48 hours of said change.

The record reflects that reasonable efforts provided, or offered to, the family included: case management services, family team meetings, Medicaid, agency foster placement and kinship foster

home, an Initial Diagnostic Interview (IDI), therapy, group substance use therapy, independent living services, legal document requests, kinship support, virtual visitation, and sibling visitation.

## 2. Motion to Terminate Parental Rights and Termination Hearing

On January 3, 2024, the State filed a motion to terminate Alexis' parental rights pursuant to § 43-292(2) (substantial and continuous neglect); § 43-292(6) (reasonable efforts failed to correct conditions leading to adjudication); and § 43-292(7) (out-of-home placement for 15 or more months out of the most recent 22 months). Regarding termination under § 43-292(6), the State specifically alleged that Alexis failed to participate in all requirements of her parole; failed to obtain and maintain safe, appropriate, and adequate, housing and provide written verification to DHHS; failed to obtain and maintain a stable and legal source of income and provide written verification to DHHS; and, despite being provided reasonable efforts, failed to place herself in a position to safely parent her minor children. The petition also alleged that termination of Alexis' parental rights was in the minor children's best interests.

The termination hearing was held over 3 days in May and June 2024. The State adduced testimony from Kathryn Herdliska, a DHHS child and family services specialist; Christine Engle, Kayson's therapist; Kaitlyn Harper, Bella's therapist; and Sydney Hirshberg, Bella's current foster care provider and Kayson's previous foster care provider. During the pendency of this case, Alexis has been in Texas either incarcerated or on parole. Alexis appeared during the termination hearing by video conferencing due to her incarceration.

### (a) Kathryn Herdliska Testimony

Herdliska, a DHHS child and family services specialist, testified that she began working with Bella and Kayson in February 2023. Her duties as a child and family services specialist included having monthly meetings to ensure that the children were safe and comfortable in their foster homes; working with families to help them achieve goals of reunification or other forms of permanency; and conducting decision-making assessments to ensure the safety of the children and other family members. Decision-making assessments are "tools used by [DHHS] to make decisions objectively, fairly, and consistently, and they are aimed to eliminate bias when we make those decisions." Herdliska testified that she has had consistent monthly visits with Kayson and Bella in their foster homes, she received reports from the children's foster parents, and she has received reports from the children's therapists regarding the children's well-being and their overall progress.

### (i) Initial Diagnostic Interview Testimony

Herdliska testified that during this case, Alexis failed to participate in an IDI which was "essential to the case [to] help the case professionals understand [Alexis'] mental health needs and how to assist her with those." Herdliska testified that Alexis self-reported a diagnosis of bipolar personality disorder but, when asked if she was participating in therapy or medication management services while incarcerated, Alexis stated that "Jesus is her medicine and that she is not in support of taking any kind of medications or participating in therapy" and that "she would rather self-medicate with marijuana."

*(ii) Agency-Supervised Virtual Visitation Testimony*

Herdliska testified that during the pendency of this case, Alexis' participation in virtual visitation was inconsistent and Alexis frequently failed to follow the agency's rules regarding visitation. Alexis participated in agency-supervised visits from July 3 to July 14, 2023, when she was discharged due to inappropriate conduct during visits. According to Herdliska, she received reports that during Alexis' video visits with the minor children "there were concerns about instilling false hope for the children about when they would be returning home and how the Courts would be proceeding with the case," and when the visitation supervisor attempted to redirect the conversation, Alexis yelled, cursed, and called the worker inappropriate names. The reports were concerning to Herdliska "due to the knowledge that there was no certainty in the [timeline] of the case and when the children would be able to reunify [because Alexis] was unable to participate in the services necessary for reunification due to her incarceration."

Despite her concerns, in August 2023, Herdliska reached out to Alexis regarding arranging agency-supervised visits, but Alexis declined, stating that she would be reaching out to "the governor, the President of . . . Washington, D.C., and other parties to retrieve her children from foster care." These comments made Herdliska "very concerned" about Alexis' "understanding of the case and her understanding of her children's needs and the relationship connections if visits were not occurring due to [Alexis'] unwillingness." And, from August 22 to 28, 2023, Alexis sent numerous text messages to Hirshberg threatening violence, eventually causing Hirshberg to block Alexis' number and to move because she was worried that Alexis would show up at Hirshberg's house.

No visits occurred from mid-July 2023 until March 2024, when Alexis expressed that she "wanted to see her children again." While working with the facility where Alexis was incarcerated to facilitate virtual visits, Herdliska contacted the children's therapists regarding the reintroduction of visits with Alexis. Bella's therapist, Harper, opined that "due to what she and Bella were working on in therapy, which is something called a trauma narrative, she would not be in support of reestablishing that contact right away, as Bella was working through some very challenging material and . . . Harper did not feel that [Bella] was in a mental space that would support contact with [Alexis] that may end," similar to when Alexis' last visits were ended by the agency supervising visits.

Similarly, Kayson's therapist, Engle, opined that due to Kayson's age, she would be in support of starting that contact eventually. However, upon conferring with Harper and learning her stance regarding Bella, Engle expressed hesitance for Kayson to begin that contact due to the closeness of Bella and Kayson's relationship and the effect it would have on both of their mental and emotional well-beings.

Herdliska testified that she had been concerned, based upon her observations and the recommendations of the children's therapists, regarding the children's emotional health and well-being if visits with Alexis were resumed. Kayson expressed that "he misses" Alexis and that he wanted Alexis to continue getting support to maintain participation in services but that he "was very hurt and angry about [Alexis'] inability to follow the agency's rules" which led to her being discharged from the initial agency in charge of visits. Bella also acknowledged that she loves

Alexis but she "held a lot of hurt that [Alexis] did not follow the rules, which led to them not being able to speak. Hers was more so hurt than it was anger."

Herdliska noted that during the pendency of this case, Alexis' visitation had not moved beyond supervised visits and Alexis showed little evidence of her ability to appropriately care for the children or demonstrate that the reasons for the children's removal had been addressed. Herdliska testified that she had been concerned about resuming visitation due to the children's ages, their relationship with Alexis, Alexis' statements to the children about reunification and her struggle to understand and acknowledge how her statements affected the children, and Alexis' comments that she did not believe that it was necessary to listen to the assigned agency worker and take redirection. Further, Herdliska testified that her opinion regarding the termination of Alexis' parental rights was impacted by Alexis' inappropriate behavior and comments during visits because Alexis

> struggled significantly to not discuss inappropriate content around her children despite receiving information regarding why that's harmful to them from both myself and the assigned agency workers. So it does concern me that if the children were to remain working towards reunification, they will continue to be exposed to comments that are very harmful for their mental health and emotional well-being and safety.

### (iii) Stable and Legal Source of Income Testimony

Herdliska testified that Alexis failed to comply with the court-ordered goal of obtaining and maintaining a stable and legal source of income and never provided verification of employment.

### (iv) Safe and Stable Housing Testimony

Herdliska testified that Alexis failed to comply with the court-ordered goal of obtaining and maintaining safe and stable housing.

### (v) Failure to Maintain Communication With DHHS Testimony

Herdliska testified that Alexis failed to maintain communication with Herdliska. She described Alexis' communication as "erratic and sporadic" and when communication did occur, Alexis screamed, called Herdliska names, cursed at her, and threatened her.

### (vi) Compliance With Parole Requirements Testimony

Herdliska testified that Alexis failed to contact her during the approximately 2-month period that Alexis was on parole in 2023 despite Herdliska's consistent attempts to contact Alexis during that period. Herdliska was unable to verify where Alexis was living and, as a result, she was unable to assess whether it was a safe and appropriate home, and Alexis failed to provide any information regarding employment. Additionally, Herdliska testified that Alexis' failure to comply with her parole requirements raised concerns regarding Alexis' ability to keep her children safe and out of dangerous situations and to meet the children's daily needs including consistent school attendance and attending appointments. Alexis was reincarcerated after she was charged with unauthorized use of a motor vehicle.

Herdliska expressed that the charges Alexis faced in Texas and her challenges with following parole requirements raised concerns regarding Alexis' "ability to care for her children on an ongoing basis, as many of those rules imposed by [parole] seemed to be imposed for the purpose of insuring that both she and those who are around her in the community were safe." Although Herdliska developed a plan for services after Alexis' release from incarceration including mediation to develop a plan for establishing permanency for the minor children, Alexis did not participate in mediation because she was unwilling to agree not to share information that occurred in the meeting.

*(vii) Best Interests Testimony*

Herdliska testified that numerous factors impacted her opinion that termination of Alexis' parental rights was in the minor children's best interests. Those factors included: the amount of time that the minor children had been in out-of-home placement; Alexis' failure to rehabilitate herself during the over 4 years that the children had been in foster care; her failure to maintain a job; her failure to follow the requirements of her parole; her unknown return date or inability to return to Nebraska; her inability to provide the level of care needed by the children; her lack of consistent contact "due to the lack of the bonds that [she] has been able to maintain with the children;" her incarceration, which raised concerns regarding her ability to achieve reunification in a timely manner; and her mental health, because she was "very reluctant to address the ways in which her mental health has at times caused emotional challenges for her children and the ways in which mental health treatment or medications may benefit the relationship between herself and . . . her children."

At the time of the termination hearing, Alexis remained incarcerated in Texas, there had been no communication regarding Alexis' expected release date, and Alexis had not expressed plans for where she would live after she is released from jail. Herdliska also opined that Alexis was not a fit parent due to her lack of progress to achieve reunification, her lack of ability to provide safe and stable housing, and her unwillingness to comply with the requirements of her parole. According to Herdliska, "extending that period of time in which the children remain in [foster] care will continue to cause further emotional harm for them" and "securing permanency for the children . . . is essential to their well-being."

Herdliska testified that while in foster care, Kayson experienced mental health struggles including regulating his emotions and demonstrating his emotions in an appropriate way and which, on multiple occasions, required inpatient hospital stays. And Kayson physically assaulted Hirshberg during a period when he was experiencing multiple mental health challenges. Despite these struggles, Herdliska testified that Kayson had engaged in therapy, had exerted efforts to better his mental and emotional health and had "grow[n] substantially."

At the time of the termination hearing, Kayson was still "experiencing many struggles regarding his lack of family connections and his lack of feeling wanted in general" and "he wants to be in a home that feels like a family and he wants to feel loved." Based upon Herdliska's observations, her conversations and experiences with Kayson, and other reports that she had received, Herdliska testified that being in foster care for 4 years had been "extremely challenging" for Kayson and that

- 6 -

Kayson has spent much of those four years searching for a place in which he feels like he belongs. He is searching for who he is and where he fits into the world. And he has experienced a great deal of, for lack of a better way of saying it, just feeling very lost, feeling like somebody who's kind of just floating. I believe he has experienced a great deal of challenges with residing in foster care and residing in different homes throughout the past for years.

And Herdliska expressed that, over the 4 years preceding the termination hearing, Alexis was not available to provide the level of support that Kayson required.

Herdliska also testified that Kayson needs permanency and that she had many concerns regarding Kayson's ongoing and future well-being if he does not have a permanent placement secured. I have a lot of worries regarding Kayson's ability to succeed in the world, as I feel that if he continues to feel as though he has, he will continue to feel lost and he will be in survival mode and it won't give him the ability to sit down and focus on his desires and his wants and to really pursue the things that he's passionate about. I think it's essential to his well-being that he feels as though he is in a place where he is loved and accepted, which will offer him the ability to start to get to know himself and to flourish.

Further, when asked what Kayson needs long-term in a primary caregiver to be successful, Herdliska responded that:

Kayson needs somebody who can show up for him in all factors of his life, whether that be physical, that is willing to support his mental health treatments that he is receiving, and that is willing to encourage him to step out of his comfort zone. Kayson for a long time I think has felt emotionally unsafe, and . . . he's searching for somebody who will show up for him and who will love him and support him. . . . he needs somebody to be there and to remind him of how far he's come and what he's capable of.

Herdliska testified that Bella struggled to maintain her grades when she was experiencing challenges "due to the level of attention and concern that was being given to her family situation" which was "all-consuming for Bella." Further, Herdliska expressed that "Bella often takes on the responsibility of someone who is older than her age in terms of feeling responsible for helping her parents act [appropriately] to maintain participation in services; but more specifically, that parenting time with her mother." According to Herdliska, Alexis had not been meeting Bella's needs for the past 4 years.

However, Herdliska testified that over the past year, Bella had "made a lot of progress" and she had observed that Bella had "really come out of her shell." She noted that Bella engaged with her therapist and had "a very mature take on how to handle very difficult situations." However, Herdliska noted that "Bella's placement in foster care ha[d] been extremely challenging for her and she . . . experienced a great deal of difficulties in understanding . . . where she came from, how she got here, and . . . where she's at now." Herdliska testified that permanency is important for Bella because "based on Bella's personality, Bella requires a level of stability and

security to encourage her continued forward progress and her continued personal growth." Herdliska also expressed that Bella needs a primary caregiver

> who can allow her to be a teenager rather than Bella feeling like she is responsible for more than she is. I believe that Bella needs somebody who can support her and encourage her and also show up for her. I think Bella also needs somebody who is willing to assist her with maintaining her sibling connections and encouraging her to grow and providing her assistance when she is struggling.

### (b) Christine Engle Testimony

Engle testified that Kayson was referred to her in July 2021 due to anger issues and difficulties at school including being suspended for fighting. Engle testified that Kayson had a psychological evaluation completed in July 2023 which resulted in him being diagnosed with multiple mental health disorders: disruptive mood dysregulation disorder, attention deficit/hyperactivity disorder (AD/HD), and borderline intellectual functioning, anxiety, and depression. Engle also testified that Kayson had been hospitalized twice: once in July 2022 for disruptive behavior and inability to regain control, and again in April 2023 for suicidal ideations. During Kayson's therapy, Kayson did not have contact with Alexis and despite Engle's attempts, Alexis was never involved with Kayson's therapy.

According to Engle, Kayson's treatment goals included working on his anger issues, symptoms related to his AD/HD, crisis intervention, monitoring, improving coping skills, listening, communicating with adults, working through past trauma, and issues related to substance abuse. Engle reported that Kayson made significant progress regarding his anger management goals including that when triggered, although he would feel angered, he would not destroy property or hurt anyone. Engle also reported that he "made good progress" using coping skills when he was feeling emotionally triggered, and regarding his substance abuse issues, Kayson was "regulat[ing] on his own" and had been sober "for quite a while."

Engle testified that Kayson struggled with being placed in four different foster homes and that he "doesn't really like foster care right now. He is really wanting to live in a family home." Engle testified that based on her education, training, and experience, permanency for a child is "very important. That's how milestones are often reached, is through structure and routine and permanency." She further opined that it was in Kayson's best interests to achieve permanency because "[h]e would like to have a family home [and] be a normal kid." Engle also testified that Kayson desired more normalcy than he currently had including that "[h]e would like to have a job, get a car, [and] be just doing normal teenage boy stuff." In Engle's opinion, to be successful long-term, Kayson needs a primary caregiver to be "[s]omeone who is stable, who is there for him that he can rely on."

### (c) Kaitlyn Harper Testimony

Harper, an outpatient mental health therapist, testified that she had been Bella's therapist since October 2023, focusing on trauma-focused cognitive behavioral therapy (TF-CBT). While treating Bella, Harper reviewed collateral information including background information provided

monthly by case workers and Bella's foster mother. Harper testified that Alexis had not been involved in Bella's therapy.

Harper diagnosed Bella with generalized anxiety disorder based on symptoms including difficulty sleeping, nervousness, worrying, stress, picking at her fingernails, and sweaty palms. The primary sources of Bella's anxiety included a sense of unpredictability within the family, stress related to Kayson's separate placement, and worry about her family members' well-being. Harper testified that unpredictability was a "a big precursor for anxiety. So anxiety, unpredictability go hand in hand. So when [Bella] doesn't know what's going on or can't predict what's going to happen next, that creates unsettledness and discomfort." Harper also reported that being in foster care has created a level of inconsistency and instability for Bella that adds to her anxiety. Harper testified that Bella was still experiencing some anxiety, mild sleep issues, worry, and stress.

Harper testified that in their early therapy sessions, Bella "identified a few experiences that were impactful on her that she thought about a lot. So I determined to go with that TF-CBT treatment where we identify one of the more prominent trauma experiences that she had, and we process and work through that using that intervention." Those experiences included witnessing drug use and violence, experiencing homelessness, and being separated from her parents.

Bella's treatment goals included processing trauma based on past experiences and developing coping skills to manage and decrease her anxiety symptoms. Harper reported that Bella had decreased anxiety symptoms, reduced nervousness, and that Bella no longer picked at her fingers or nails. Harper also reported that Bella displayed increased focus and concentration, her grades and self-esteem improved, and she was reporting an increased interest in sports and "hanging out with peers." Harper testified that Bella had "done really well . . . adhering to . . . coping skills to manage her anxiety, and processing through [the] experience that she had identified as the most impactful at the time. So telling through that story and working through any cognition that may be developed." Harper reported that Bella "has a healthier perspective and belief system on those things. So she's able to separate those past experiences from the current . . . reality of what's going on now."

In April 2024, Bella's caseworker, Herdliska, reached out for Harper's opinion regarding Alexis resuming visits with Bella. Harper expressed reservations about reintroducing visits at that time, noting that she and Bella were "in the heart of processing that trauma. We were doing what's called trauma narrative so kind of the most significant part. And I felt that [the] timing wasn't the best to start those visits right in the middle of processing trauma that included [Alexis] and suggested that we needed to wait until that had concluded just to make sure there was no disruption to that processing." However, at the time of the termination hearing, Harper opined that Bella "ha[d] processed that trauma in a healthy way" and had "acquired the skills and tools to manage any stressors or challenges that could potentially come from that contact again."

Harper testified that, based upon her education, training, and experience, children need permanency

> [e]specially kids who are displaying anxiety symptoms, that stability of consistency and structure creates predictability which predictability helps decrease those anxiety symptoms or . . . the potential for anxiety symptoms because they know where they're going to be, what's going to happen next, who they're going to be with, eliminates confusion or stress

or worry about what could be. It just kind of answers those questions and makes it a lot simpler for them.

Harper also testified that it was in Bella's best interests for her to achieve permanency. She expressed that permanency is

important for any child. But for Bella in particular, she's had several years of not really sure what's going to happen next, and we can see it as evidenced by her anxiety symptoms. I think despite those improving, she still has some confusion and questions as to what's going to happen next. So that stability could provide her one piece of reassurance . . . and predictability of, this is where I'm going to be, that's not going to change, or we know what's going to happen in the future.

Harper further opined that it was not in Bella's best interests to continue to languish in foster care awaiting parental maturity because "[i]t continues to contribute to that sense of unpredictability, confusion, what's going to happen next, where am I going, where will I be just once again, which leads to, likely, her anxiety symptoms." Harper also opined that in order for Bella to be successful long-term, she needs a home that provides structure and consistency, that is not overly reactive, and that can be a calm and safe space for Bella. Harper explained that if Bella has a primary caregiver who was emotionally reactive, which Bella identified as "someone who escalates quickly, specifically [to] anger, can be challenging for her [and] piques her anxiety symptoms and prefers . . . to avoid those types of dynamics and interactions as much as possible."

(d) Sydney Hirshberg Testimony

Hirshberg testified that she became 11-year-old Bella and 13-year-old Kayson's foster care provider in August 2022. Bella has resided continuously with Hirshberg since August 2022, but Kayson was placed with a different provider in May 2023. According to Hirshberg, during Kayson's placement with Hirshberg, he had a lot of anger, got into fights at school, was vaping and smoking marijuana, and was violent toward Bella. He was "very good at masking and acting like things are okay and hiding . . . how he's feeling. And so on the surface he . . . seemed to be doing very well. But he definitely struggled with . . . anger and guilt associated with . . . being in foster care." During Kayson's placement with Hirshberg, Kayson struggled with his mental health but, after several months, he became more open to therapy and began seeing his therapist regularly. Kayson was unhappy being in foster care.

Kayson was removed from Hirshberg's placement after Kayson attacked Hirshberg on Memorial Day weekend in 2023. Hirshberg explained that she was talking with Kayson regarding his increased aggression towards Bella. After the conversation turned heated, Hirshberg attempted to leave the room, but Kayson "started screaming that he was going to kill me" and "[h]e ran across the room and shoved me into a door." Hirshberg "fell to the ground, lost feeling in my legs, and [Kayson] started to kick and stomp on me until a friend of his who was with us came out of the bathroom and pushed him off of me. And he ran out of the house and ran away." Hirshberg suffered a cracked rib and some bruising. She and Bella stayed with Hirshberg's parents for a period of time because they did not feel safe at Hirshberg's home. After this incident, Kayson was placed with a different provider, but eventually Hirshberg and Kayson resumed contact and Hirshberg

- 10 -

testified that she maintains monthly contact with Kayson. Additionally, she testified that she has contact with Kayson during visits with Bella and he spent Christmas and another recent weekend at Hirshberg's home. During the Christmas visit, Kayson seemed "uncomfortable," but he was "kind" and "polite." Kayson also visited for Easter and the week of Bella's birthday and attended Bella's birthday party. Since that time, Kayson has visited Hirshberg's home several times to spend time with Bella.

Hirshberg testified that when Bella was first placed with her, Bella "was kind of a wallflower. She didn't draw any attention to herself. She was very quiet. She slept a lot. She had middle-of-the road grades. . . . She didn't put in a whole lot of effort into socializing or making friends." However, since being placed with Hirshberg, Bella has "really come out of her shell, making friends, and also just being comfortable with who she is and the things that make her who she is. And she's learning how to . . . vocalize those things, which is really great."

From August to December 2022, Hirshberg supervised telephone calls between Bella and Alexis. Alexis was never authorized to have unsupervised contact with the children. Hirshberg stated that she had to end almost every call that the children had with Alexis due to Alexis continuing to say negative things during the telephone calls after being instructed to be more positive with the children, providing hope that at one point Alexis and the children would be reunited, speaking negatively about the juvenile case, and making comments that Hirshberg could not be trusted. After those calls, the children would retreat to their rooms and spend a lot more time by themselves.

Hirshberg testified that after Alexis' virtual visits with the children stopped in 2022, the children's behavior issues at school decreased, they socialized more, and they spent more time with friends outside of school. Additionally, Kayson expressed that he wanted to participate more in therapy and to have in-person visits with his therapist. Kayson also became less withdrawn, started spending less time in his room, and "started going outside and playing more."

After Kayson was removed from Hirschberg's home, Bella struggled with stress at school and ran away for a few hours. After returning, Bella agreed to restart therapy to address her anxiety. Since resuming therapy, Bella's anxiety has decreased, she wants to be with people, she has made numerous friends, she became vocal regarding her preferences, and she began setting boundaries.

Hirshberg testified that Bella's routines involved attending school, participating in sports including volleyball and basketball, improving her grades to the extent that she was placed on the honor roll, assisting with chores, and attending church. According to Hirshberg, Bella still struggles with anxiety and overthinking, which causes her to withdraw, but her therapy sessions have been helpful. Hirshberg testified that she handles Bella's appointments, and that Alexis has never attended those appointments. Further, Hirshberg testified that Alexis has not provided any clothes, food, money, gifts, or cards, for the children during their placement with her.

Hirshberg testified that to be successful long-term, Kayson needs a primary caregiver to provide structure and a consistent schedule and Bella needs consistency and someone who will give her the space to open up about her feelings especially her feelings regarding her family.

### 3. Order Terminating Alexis' Parental Rights

On July 2, 2024, the juvenile court entered an order terminating Alexis' parental rights pursuant to § 43-292(2), (6), and (7); finding that Alexis was not a fit or proper parent; and finding that termination of Alexis' parental rights was in the minor children's best interests.

## III. ASSIGNMENTS OF ERROR

Alexis contends that the juvenile court erred in (1) terminating her parental rights pursuant to § 43-292(2), (6), and (7); and (2) in finding that termination of her parental rights was in the minor children's best interests.

## IV. STANDARD OF REVIEW

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. *Id.*

## V. ANALYSIS

### 1. Statutory Basis for Termination of Parental Rights

Alexis' first assignment of error is that the court erred in terminating her parental rights pursuant to § 43-292(2), (6), and (7).

To terminate parental rights, it is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024).

We first address whether the court erred in terminating Alexis' parental rights pursuant to § 43-292(7). Section 43-292(7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *Id.* In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *Id.* And, as the Nebraska Supreme Court recently clarified in *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023), the trigger date for determining the look back period for grounds under § 43-292(7) is the date that the petition for termination of parental rights is filed.

In the present case, the evidence established that Kayson and Bella were placed in the care and custody of DHHS on January 31, 2020, and remained in out-of-home placement during the pendency of the case. At the time the petition to terminate Alexis' parental rights was filed on January 3, 2024, the minor children had continuously been in out-of-home placement for approximately 47 months, which is well beyond the 15-month time period set forth in § 43-292(7). Because both minor children have been in out-of-home placement for 15 or more months of the most recent 22 months, we find that the court did not err in finding that statutory grounds existed for termination of Alexis' parental rights under § 43-292(7).

We note that Alexis argues that "the juvenile court erred in finding that the State presented clear and convincing evidence to prove the statutory grounds for termination of [Alexis'] parental rights because the State's basis for terminating her parental rights rested solely upon her incarceration." Brief for appellant at 16. Although we acknowledge that Neb. Rev. Stat. § 43-292.02(2)(b) (Cum. Supp. 2024) prohibits incarceration from being relied upon as "the sole factual basis" for termination, where, as here, termination is grounded in § 43-292(7), incarceration is not being relied upon as "the sole factual basis" for termination; instead, the children's out-of-home placement is being relied upon. See *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). Out-of-home placement is itself defined by the Legislature as an independent ground for termination, since "[c]hildren cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Mateo L. et al.*, 309 Neb. at 580-81, 961 N.W.2d at 528. Because we have found that § 43-292(7) existed as an independent statutory ground for termination in this case, Alexis' incarceration was not the "sole factual basis" relied upon for termination. We reject Alexis' argument.

Finally, having determined that statutory grounds existed for termination of Alexis' parental rights under § 43-292(7), we need not further address the sufficiency of the evidence to support termination under any other statutory ground. See *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019) (if appellate court determines that lower court correctly found that termination of parental rights is appropriate under one of statutory grounds set forth in § 43-292, appellate court need not further address sufficiency of evidence to support termination under any other statutory ground).

## 2. BEST INTERESTS

Alexis' second assignment of error is that the juvenile court erred in finding that termination of her parental rights was in the minor children's best interests.

In addition to proving at least one statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.*

The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the child's best interests. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's well-being. *Id.* The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.* In cases where termination of parental rights is based on § 43-292(7), appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is in fact in the child's best interests. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019).

Termination of parental rights is a final and complete severance of the child from the parent and removes the entire bundle of parental rights. *In re Interest of Destiny H. et al.*, 30 Neb. App. 885, 974 N.W.2d 343 (2022). Therefore, with such severe and final consequences, parental rights should be terminated only in the absence of any reasonable alternative and as the last resort. *Id.* The law does not require perfection of a parent. *Id.* Instead, we should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *Id.* Whereas statutory grounds are based on a parent's past conduct, the best interests inquiry focuses on the future well-being of the child. *Id*.

Alexis argues that the State relied too heavily here on her incarceration and failed to otherwise show her parental unfitness or demonstrate why termination was in the best interests of her children. We disagree.

Although parental rights may not be terminated solely for a parent's incarceration, parental incarceration is a factor which may be considered in determining whether parental rights should be terminated. *In re Interest of L.V.*, 240 Neb. 404, 482 N.W.2d 250 (1992). It is proper to consider a parent's inability to perform parental obligations because of imprisonment, the nature of the crime committed, as well as the person against whom the criminal act was perpetrated. *In re Interest of Kalie W.*, 258 Neb. 46, 601 N.W.2d 753 (1999). See, also, *In re Interest of Joezia P.*, 30 Neb. App. 281, 968 N.W.2d 101 (2021). Incarceration of a parent is not supposed to insulate an inmate from termination of his or her parental rights if the record contains the clear and convincing evidence that would support the termination of the rights of any other parent. *In re Interest of Brettany M. et al.*, 11 Neb. App. 104, 120, 644 N.W.2d 574, 588 (2002).

In that regard, Alexis' incarceration was the product of a decision she made that resulted in her separation from her children. And prior to being incarcerated, Alexis left her children in the care of an inappropriate caregiver who was living in a halfway house and who was later removed for using methamphetamines.

Even while incarcerated, Alexis continued to make decisions that were not in her children's best interests and were contrary to the court's orders. For instance, while participating in supervised visitation, which never progressed to unsupervised visitation, Alexis made inappropriate remarks about DHHS personnel as she attempted to undermine their authority and plant the seeds of discontent within her children while never accepting responsibility for her own actions. Alarmingly, during communications with both Herdliska and Hirshberg, individuals appointed to assist her during her period of incarceration, she made threats of violence towards them which resulted in the interruption of her supervised visitation privileges, and which caused Hirshberg to move homes out of consideration for her own safety.

And although Alexis asks us to focus on her inability to participate in court-ordered services while she was imprisoned, it is notable that she was paroled in the summer of 2023. But rather than contacting Herdliska to pursue or conform with court-ordered requirements, she apparently moved in with her boyfriend in Texas and violated parole by taking an unauthorized vehicle to allegedly drive to Omaha to retrieve her children. Also, while on parole, Alexis violated her parole requirements to participate in psychiatric visits, to take her medication, and to participate in therapy. This violation is significant due to her diagnosis of bipolar personality disorder but also demonstrates her refusal to comply with her parole obligations and the associated juvenile court order which required her to follow those directives. This resulted in Alexis being incarcerated

again and constituting another decision which continued the separation from her children. The result of Alexis' decisionmaking and conduct was that, at the time of trial, Alexis had been separated from her children for over 4 years.

But in addition to failing to comply with court orders, there was significant evidence offered by the State in the form of testimony from her children's therapists which documented their psychological problems caused by Alexis' prior conduct. That testimony demonstrated how the children have improved under the watchful eye of their therapists and caregivers and included testimony of concerns of even reintroducing supervised visits because of Alexis' prior conduct and concerns about regression from the progress that the children had made. There was significant testimony about the importance of creating permanency for these children as it related to their conditions and to continue the progress that has been made through 4 years of therapy. And as it relates to permanency, Alexis provided no timeline for her eventual release from prison and no indication of any willingness to accept responsibility for her prior conduct and her children's conditions or any indication of future willingness to accept therapy, medication, or other services designed to allow her to eventually reunite with her children. To the contrary, every indication made by Alexis was one of defiance including her threats against caseworkers and threats to remove the children from the state herself notwithstanding the court's orders.

When a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015).

On this record, we find by clear and convincing evidence that the State proved statutory grounds for termination and that termination of Alexis' parental rights is in the children's best interests.

## VI. CONCLUSION

Because we find that statutory grounds for termination existed and that the evidence was sufficient to support the court's finding that termination was in the best interests of the children, we affirm.

AFFIRMED.